2017 IL App (1st) 140204
No. 1-14-0204
Opinion filed February 15, 2017

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) <br> ) Appeal from the <br> ) Circuit Court |
| Plaintiff-Appellee, | ) of Cook County, <br> ) Illinois. |
| v. | ) <br> ) No. 03 CR 01532(04) |
| DANIEL OCHOA, | ) <br> ) The Honorable |
| Defendant-Appellant. | ) Thomas V. Gainer, Jr., <br> ) Judge Presiding. <br> ) |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the Court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1      Following a jury trial, defendant Daniel Ochoa was convicted of first degree murder and

aggravated discharge of a firearm in the 2002 shooting death of 15 year-old Marilu Socha.

The jury also found that defendant personally discharged a firearm that proximately caused

the death of the victim.[1] The trial court sentenced defendant to 45 years' incarceration for

_____

[1]This is defendant's second trial. On direct appeal from his first trial, this court reversed, based upon improper admission of statements by police that, after talking to defendant's codefendants, they

first-degree murder, 35 years' incarceration for the firearm sentence enhancement, and 10 years' incarceration for aggravated discharge of a weapon, to be served consecutively. On appeal, defendant contends the trial court erred where (1) he was denied his right to confrontation where the State elicited improper hearsay testimony from police officers, (2) it improperly allowed the State to argue that the shooting was a gang initiation, and (3) the firearm sentence enhancement is unconstitutionally vague on its face and as applied to him. For the following reasons, we reverse and remand for a new trial.

¶ 2                                   I. BACKGROUND

¶ 3        In brief, defendant was arrested two days after Socha was killed in a gang-related shooting. At that time, three other men[2] were being held for involvement in the shooting, two of whom were arrested after allegedly being involved in a subsequent, unrelated incident using the same distinctive vehicle that was used in Socha's murder. Defendant, who speaks only Spanish, signed a statement written in English with translation by the lead detective on the case, in which he confessed to the crime.

¶ 4        Defendant was tried in 2005 and found guilty of the first degree murder of Socha, as well as aggravated discharge of a firearm for shooting at Joe Maldonado but hitting and killing Socha. Defendant appealed, arguing in part that the trial court erred when it allowed hearsay evidence of co-defendants' statements implicating defendant. *People v. Ochoa*, No. 1-05-1848 (2007) (unpublished order under Supreme Court Rule 23). This court reversed defendant's conviction and remanded for a new trial. *People v. Ochoa*, No. 1-05-1848 (2007)

---

were looking for two offenders, Spook and Chilango. The State also introduced hearsay statements containing defendant's physical description and his home address. *People v. Ochoa*, No. 1-05-1848 (2007) (unpublished order under Supreme Court Rule 23).

[2]Co-defendants Arturo Bentazos, Arturo Simon, and Eduardo Torres were tried separately from defendant and are not parties to this appeal.

(unpublished order under Supreme Court Rule 23). We held, in part, that the "State repeatedly elicited testimony that contained a strong inference that the co-defendants implicated defendant in their statements. This exchange went beyond mere questioning concerning the investigatory process, and included serial questions to build the inference that defendant was named by his criminal cohorts" and that the State improperly "reinforced this evidence by reminding the jury multiple times during closing arguments that, after police interviewed the co-defendants, they knew they were looking for a person with the precise characteristics of defendant." *People v. Ochoa*, No. 1-05-1848 (2007) (unpublished order under Supreme Court Rule 23).

¶ 5        Defendant was tried again in 2013[3] and found guilty of first degree murder and aggravated discharge of a firearm. It is from this conviction that defendant now appeals.

¶ 6        Prior to trial, defense counsel filed a motion *in limine* asking the court, in part, to exclude "inadmissible hearsay evidence inferring the co-defendants' identification of defendant." The court held a hearing during which the parties acknowledged that this type of hearsay was the reason the case was reversed in 2007 and was now on retrial. The court granted the motion *in limine* to prohibit evidence of the co-defendants' statements implicating defendant, saying it was sure nobody wanted to try the case a third time and that "we can walk around very carefully at the time the two witnesses, [Detective] Lopez and [Detective Garcia] are on the stand."

¶ 7        At trial, Joe Maldonado testified that on December 17, 2002, he was 18 years old and was a member of the Two-Six street gang in Chicago.[4] Around 7:30 that evening, he was at his

---

[3]We refer herein to the 2005 trial as the "first trial" or the "prior trial," and to the second trial as the "trial."

family's grocery store on Kostner Avenue and 26th Street. He testified that this area was controlled by the Two-Six street gang. His girlfriend, victim Socha, came into the store. They left together, walking a few blocks to Socha's friend Lilly's house in the 3000 block of South Kolin Avenue. Maldonado and Socha stood outside the house, talking for a few minutes. Maldonado's back was to the street. He heard a vehicle's brakes squealing nearby. As he turned toward the sound, he saw "flashes" coming from the back, driver's-side window of a green car and then heard six gunshots coming from the car. The driver's window of the car had a plastic bag covering it. Maldonado did not get a good look at the vehicle's occupants, but testified there were three or four individuals who appeared to be Latino men with short hair. As the green car slowly pulled away from the scene, Maldonado heard the occupants yell "King love." Maldonado explained that "King love" signified that the occupants were members of a rival street gang, the Latin Kings. Maldonado identified a photograph at trial of the distinctive green vehicle with the plastic covering the driver's side window as the vehicle used in the shooting.

¶ 8 Emergency services arrived and transferred Socha to the hospital. Maldonado stayed at the scene to talk with the police. Eventually, the police took Maldonado to the police station, where he provided a statement to the police and was held until the next day.

¶ 9 Andrew Linares, a Two-Six gang member, testified he and a friend, Juan Morales[5], were walking a few blocks away when they heard gunshots. As they ran toward the sound of the gunshots, a green car with plastic covering the driver's window and the rim of the passenger

---

[4]Although Maldonado testified on direct exam that he was a member of the Two-Six gang at the time of the shooting, on cross-examination he admitted that, at the time of the shooting, he was actually an ex-member of the gang, and had so testified in a 2005 hearing. He explained that, to get out of the gang, he had to take a "violation" or "get a beating." He had done so and, by the time of the shooting, was, apparently, no longer a member of the Two-Six gang. He still lived in Two-Six territory and had friends who were active Two-Six gang members.

[5]Juan Morales is also known as Canello.

side rear tire missing sped by. Linares could see four or five individuals in the car and heard them yelling "King love," which he understood to mean that they were members of the Latin King street gang. Linares was familiar with both the Latin Kings and the Two-Six because they were gangs in his neighborhood. Linares continued running until he saw Maldonado holding Socha, who was bleeding from her mouth.

¶ 10     That same evening, Chicago Police Officer Esmelita Torres[6] heard a police radio broadcast of shots fired, along with a description of the distinctive green vehicle. At approximately 9:30 p.m., Officer Torres observed a green car with plastic on the driver's-side window double-parked near 2410 South Spaulding Avenue. She radioed for backup and then approached the vehicle. Co-defendant Bentazos was sitting in the driver's seat. Bentazos got out of the car, and Officer Torres handcuffed him and placed him in her squad car. Officers then went into the three-flat at 2410 South Spaulding Avenue and, eventually, apprehended co-defendant Simon[7] and Ricardo Argueta. Officers placed these men in a squad car.

¶ 11     Officers recovered a beer bottle, a knife, and a beer can from the vehicle. A fingerprint lifted from the knife matched Simon. Police also recovered cartridge casings from the scene of the shooting and a cartridge case from the center console of the green car. After testing, it was determined that the cartridge case recovered from the green car's console was fired from the same firearm as the cartridges found at the scene of the shooting.

¶ 12     Forensic Scientist Ellen Connolly Chapman testified as an expert in the field of trace evidence analysis that clothing from Bentazos and Simon tested positive for gunshot residue.

---

[6]Officer Torres is now a Chicago Police Sergeant. Because she was an officer at the time at issue, for clarity we refer to her here as Officer Torres.
[7]Simon is also known as Carlos Morales.

Bentazos's and Simon's hands tested negative for gunshot residue. Defendant, who was arrested later, apparently was not tested for gunshot residue.

¶ 13        Chicago Police Detective Adrian Garcia testified that he and his partner, Detective Patrick Finucane,[8] were assigned to investigate the shooting at approximately 8:30 p.m. on Decmber17, 2002. They went to the scene of the shooting and saw that it was secured with yellow crime scene tape and that there were uniformed officers present. They spoke with the officers at the scene, as well as with witnesses, including Maldonado, Linares, and Morales. While still on the scene, Detective Garcia monitored a police radio call of a "non-shooting incident" involving a green car with plastic covering the driver's side window.

¶ 14        The detectives eventually went to 2410 South Spaulding Avenue, where they saw the green vehicle along with uniformed officers detaining Bentazos, Simon, and Argueta. The car's rear tire "looked to be like a spare tire with no hubcap," which was significant because Detective Garcia had learned that the car involved in the shooting also had a rear tire with no hubcap. Detective Garcia requested that the evidence technicians process the green car. After seeing that the subjects were transferred to the police station, the Detectives proceeded to Mount Sinai Hospital to see the victim. They learned that the victim had died from the gunshot wound.

¶ 15        Subsequently, Detective Garcia went to the police station and collected articles of clothing from Bentazos, Simon, and Argueta to be tested for gunshot residue. Detective Garcia testified that, at that time, witnesses Maldonado, Linares, and Morales—as well as suspects Bentazos, Simon, and Argueta—were all at the police station. In the early morning hours of December 18, 2002, a line-up including Bentazos and Simon was conducted at the

---

[8]Detective Finucane passed away prior to trial.

police station. Maldonado, Linares, and Morales each separately viewed the lineup, and none was able to make an identification. Detective Garcia then testified:

"[ASA LYNCH:] Q. After these line-ups, Simon and Bentazos were still in custody at Area 4, correct?

[DETECTIVE GARCIA:] A. Yes.

Q. After dealing with Bentazos and Simon, what did you do next in this investigation?

A. We obtained information of two additional offenders.

[ASSISTANT PUBLIC DEFENDER CHRISTL:] Objection.

THE COURT: Sustained. Disregard that answer, ladies and gentlemen."

Defense counsel requested a sidebar, which the court granted outside of the hearing of the jury. At the sidebar, defense counsel asked for a mistrial, arguing:

"[ASSISTANT PUBLIC DEFENDER CHRISTL:] Judge, at this time, I would ask—I mean, I know that you sustained my objection and asked the jury to disregard. At this point, I would ask for a mistrial. This was specifically what we covered in our motions in limine. This is why the case got reversed after the first trial.

***

I thought that you ruled during the motion in limine—I ordered the transcript, but I don't think I got it yet. My recollection was that you ruled that that type of testimony would be inadmissible.

[ASA HOLLAND:] If I may?

THE COURT: Go ahead.

[ASA LYNCH:] When you asked me how I was going to put this testimony, I said I was going to do exactly what I just did. Merely that these two individuals were in custody and no testimony about taking statements from them at all. Not even whether they were spoken to by police which has not even been elicited.

The question that as just asked was after dealing with Bentazos and Simon, what did you do next? He merely said we got information that the two additional offenders [*sic*]. Absolutely no tie or nexus to these other gentlemen being the source at all. There is not even testimony to this point that the police even took a statement of any kind or had any conversation with Bentazos or Simon. I don't know how else you can actually do it.

The problem last time was—

THE COURT: I am reading the problem.

[ASA LYNCH:] Okay.

[THE COURT: Here is the testimony of Garcia that was critical and very important to the reversal of this case:

'Question posed by the prosecutor:

Besides the witnesses, were co-defendants Simon and Bentazos still at the police station?

Answer: Yes they were, ma'am.

[Q.] Were interviews conducted in the late hours of December 17th and early morning hours of December 18, 2002?

Answer. Yes, they were.

Question. After interviews were conducted, did your investigation continue?

8

Answer. Yes, it did, ma'am.

[Q.] Were you looking for any other offenders?

Answer. Yes. Due to our interviews with Mr. Simon and Mr. Bentazos, we were able to obtain two nicknames also involved in the shooting which they gave us.

Defense counsel: Objection.

Court: Sustained. Rephrase your question.

State [Q.]: After interviews were conducted, were you looking for any other offenders or possible offenders?

[A.] Yes, we were looking for two subjects, one by the street name of Chilango.

Lopez testified did you—

Prosecutor [Q.]: Did you see Eduardo Torres when he was brought into Area 4 in the early morning hours of December 19, 2002?

Detective Lopez [A.]: Answer. I did.

[Q.] Did your investigation continue into the homicide of the 15-year-old Ms. Socha at this point?

[A.] Yes.

[Q.] Were interviews conducted?

[A.] Yes.

[Q.] After the interviews were conducted at approximately 3:30 to 3:45 a.m. still on December 19th, did you have occasion to leave Area 4?

[A.] Yes.

[Q.]When you left Area 4, were you going to a specific location?

[A.]Yes. We were directed to 2442 South St. Louis on the first floor.

[Q.] When you say you were directed to 2442 South St. Louis on the first floor, were you specifically looking for someone at that address?

[A.] Yes. I was looking for a male Hispanic named Chilango who also went by —who also had a first name of Alberto who was a male Hispanic approximately five-six, medium build, with a tattoo on his arm which said Beto.' "

¶ 16    The court then continued to read this court's Rule 23 Order, in which we described that, under the law, an officer may reconstruct the steps taken in the investigation of a crime, but must not reveal the contents of the conversation itself, and that the officer's testimony must be limited so as not to place into evidence the substance of any out of court statements or conversations for the purpose of establishing the truth of their contents. The trial court read the portion of the Order stating:

> "We find the detective's testimony was inadmissible hearsay. The State repeatedly elicited testimony that contained a strong inference that the *** co-defendants implicated defendant in their statement. This exchange when beyond mere questioning concerning the investigatory process and included serial questions to build the inference that the defendant was named by his criminal cohorts."

After reading this court's prior decision, the trial court denied the motion for a mistrial and instructed the parties:

"THE COURT: This [what happened in the previous trial] is not what happened here. I am going to call the jury out. I am going to tell them to disregard the last question and answer. I want you to simply ask him what was the next thing they did in their investigation that night and move on from there and do not go anywhere near conversations."

¶ 17    The jury returned and the court admonished them:

"[THE COURT:] Ladies and gentlemen, you are to disregard the last question and answer."

The court also admonished Detective Garcia not to mention the fact that he had any conversations with Simon and Bentazos. The following testimony then transpired:

"[ASA LYNCH:] Q. After these line-ups, Detective, what is the next thing you did in your investigation?

[DETECTIVE GARCIA:] A. We—we had information on two additional persons.

[ASSISTANT PUBLIC DEFENDER CHRISTL:] A. Objection.

THE COURT: Disregard that question and that answer. Ask your next question.

[ASA LYNCH:] Q. What is the next thing you did in this investigation?

A. We were looking for two other subjects.

Q. What information did you initially have about these two subjects?

A. We had nicknames.

Q. What were the nicknames?

A. One by the name of Chilango (phonetic) and the other by the name of Spook.

Q. That evening were you able to determine the identity of this person named Spook?

A. Yes, we were.

Q. Who was that?

A. His name was Eduardo Torres.

Q. At this time, were you able to determine the identity of the person that went by the nickname Chilango?

A. No.

[ASSISTANT PUBLIC DEFENDER CHRYSTL:] Objection.

THE COURT: The answer may stand."

Detective Garcia went on to testify as to how he attempted to locate Torres throughout the morning hours of December 18, but was unsuccessful. Over defense counsel's objection, Detective Garcia testified that he never developed any evidence pointing to Argueta's involvement in this case. He also agreed that he was still trying to "develop information to figure out who this Chilango person was" and that, by late afternoon on December 18, after having worked over 24 hours, he turned the investigation over to Detective Gene Schleder and Detective Jose Lopez.

¶ 18    Chicago Police Detective Jose Lopez[9] testified that he was assigned to this investigation after Detective Garcia went off-duty on December 18, 2002. He testified that, when the case was turned over, both Bentazos and Simon were in custody. He and his partner, Detective Schleder, proceeded to look for two "additional offenders": Torres and a "subject by the

_____

[9]At the time of trial, Detective Lopez was a Sergeant. Because he was a detective at the time in question, we refer to him herein as Detective Lopez.

nickname" of Chilango. He continued through questioning to explain that they eventually brought Torres in after arresting him at 2501 South Drake around midnight. He and his partner continued attempting to "develop information" on Chilango. He testified:

"[ASA HOLLAND:] Q. And was Eduardo Torres subsequently brought to area four [police station]?

[DETECTIVE LOPEZ:] A. He was.

Q. Did you continue your investigation into Marilou's murder at that time?

A. Yes.

Q. Did you have an opportunity to leave area four at approximately 3[:]45 a.m. that morning?

A. Yes.

Q. When you left area four were you going to a specific location?

A. Yes.

Q. Where were you going?

A. The tenth district 2448—the 2400 block of south Spaulding I believe it was.

Q. Okay, did you subsequently relocate to 2442 South Saint Louis, first floor?

A. Saint Louis, yes, sir.

Q. Okay. And were you looking for a specific person at that address?

A. Yes, sir.

Q. Who were you looking for?

A. Male, Hispanic by the—with the nickname of [Chilango] or [Beto].

Q. And did you have any other identifiers of that individual?

A. Medium height 5 6 with a tattoo on his arm.

[ASSISTANT PUBLIC DEFENDER CHRISTL:] Yes, sir. [*sic*]

THE COURT: Basis.

[ASSISTANT PUBLIC DEFENDER CHRISTL:] Hearsay.

THE COURT: Overruled.

[ASA HOLLAND:] Q. You may continue.

[DETECTIVE LOPEZ:] Q. That was the approximate description."

Detective Lopez then testified that he and other officers went to the two flat building at 2442 St. Louis Avenue, which he knew to be territory controlled by the Latin Kings street gang. Detective Lopez knocked on the front door and defendant, wearing no shirt, answered. Detective Lopez asked defendant his name and if he lived there. Defendant stated that his name was Daniel Alberto Ochoa, and that his nickname was Chilango. Detective Lopez and defendant spoke to one another in Spanish. Defendant was taken into custody by other detectives. Once defendant was secured by the other detectives, Detective Lopez spoke with the other occupants of the residence, and asked the lease holder if he could look around. He was given verbal consent, but no written consent form was signed. Detective Lopez searched the apartment for a weapon or other evidence, but found none.

¶ 19    Detective Lopez returned to the police station, where he interviewed defendant in Spanish. He testified that, during the interview, he had no difficulty understanding defendant's Spanish and that defendant never indicated he did not understand Detective Lopez's Spanish. Detective Lopez testified he read defendant his Miranda rights in Spanish and that defendant agreed to speak with him. Detective Lopez informed defendant that Bentazos, Simon, and Torres were in custody. He testified that defendant confessed to the

14

shooting, describing how he aimed and fired the gun at a Two-Six gang member and did not know until later that he shot a girl instead. Soon after, ASA Kent Delgado arrived and hand-wrote defendant's statement in English, with defendant speaking in Spanish and Detective Lopez translating it to English. Defendant, Detective Lopez, and ASA Delgado each signed each page of the statement. Detective Lopez testified that he translated everything correctly.

¶ 20        Detective Lopez read defendant's statement in court, including a recitation of defendant's personal history, and that he arrived in the United States from Mexico in February 2002. He first lived in California and then moved to Chicago in May 2002, where he worked as a day laborer. On the evening of December 17, 2002, Torres, who was defendant's roommate, and was also known as Spook, retrieved a semiautomatic handgun from the bathroom cabinet and instructed defendant to follow him.

¶ 21        They got into a green four-door car with two other men. Defendant was aware that Torres and Simon were both members of the Latin Kings street gang, but was unsure of the driver's gang affiliation. Defendant denied that he was a gang member. Simon suggested they go to "two-Six territory." Defendant explained that "Two-Six" is a rival street gang. Torres placed a bullet in the chamber of the gun, gave the gun to defendant, and said, "It's ready." Defendant understood this to mean that he was supposed to shoot a Two-Six gang member. All of the car windows were open, and the driver's side window was covered with plastic. Near Karlov Avenue[10] and 30th Street, defendant saw an unarmed young man standing on the sidewalk with his hat turned to the right, signifying Two-Six gang membership. They drove past once, and Torres told defendant he should have shot the man. On their return, defendant saw that there was a girl standing near the man on the sidewalk. The driver

---

[10]Although defendant stated the murder happened on Karlov Avenue, it was clarified at trial that it occurred on Kolin Avenue.

15

stopped the car and defendant reached across Simon, pointed the gun out the back driver's side window, and shot at the man three or four times. Defendant did not know he had shot the girl.

¶ 22    Defendant and Torres went out for beers that night. He only realized he shot the girl when he saw it on the news the next day.

¶ 23    Detective Lopez did not ask defendant what he was wearing at the time of the shooting in order to attempt to collect the clothing to test for gunshot residue. At the end of their conversation with defendant, Detectives Lopez and Schleder left the interview room and notified the Felony Review Unit of the Cook County State's Attorney's Office. It was approximately 7:00 a.m.

¶ 24    On cross-examination, Detective Lopez admitted that, although he was born in Mexico City, moved to Chicago at a young age, and speaks Spanish with his family at home, he cannot write in Spanish. He explained that he "read[s] Spanish well" and that his "grammar is poor in both English and Spanish." He took one year of Spanish in college. In 2002, he was not certified as an official interpreter for the Chicago Police Department.

¶ 25    ASA Kent Delgado[11] testified that that he took defendant's statement on December 19, 2002. He knew at the time that defendant spoke Spanish and did not speak English. ASA Delgado does not speak or write Spanish. He did not ask for a translator, but instead had Detective Lopez, who he said was fluent in Spanish, translate the conversation between ASA Delgado and defendant. This interaction was neither videotaped nor audiotaped. Via Detective Lopez' translation, ASA Delgado offered defendant various ways to memorialize his statement. Defendant chose a handwritten statement in which he would say something,

---

[11]By the time of trial, Kent Delgado was in private law practice. As he was an Assistant State's Attorney at the time in question, we will refer to him herein as ASA Delgado.

Detective Lopez would translate it, and ASA Delgado would write it down. Defendant was not given the opportunity to write his own statement in Spanish. Once the statement was written, Detective Lopez translated each sentence for defendant so that defendant could make any changes necessary. Detective Lopez was present for the entirety of ASA Delgado's interactions with defendant.

¶ 26    Defendant's statement was admitted into evidence. In part, it read:

"Daniel states that he speaks Spanish, but not English. *** Daniel states that he's twenty years old and was born on September 1, 1982, in Mexico, and states he came to the United States in February of 2002. *** Daniel states that he came to Chicago with a friend named Daniel Montes who introduced him to a guy named Alejandro who lived at 1622 South Cicero. Daniel states Alejandro had two friends named Eduardo and Magic. Daniel states that he met Eduardo who he also knows as Spook in July of 2002. *** Daniel states that he met Magic in August of 2002.

***

Daniel states that on Tuesday, December 17th, he was at his house around 7:30 p.m. when Eduardo came over. *** Daniel states that when Eduardo came over, Eduardo when into the bathroom and got a gun from the cabinet, which had been there since Monday. Daniel states the gun was a semiautomatic square black handgun. Daniel states that Eduardo told him to come with him and they went outside and got into a green four door car. Daniel states that Magic was in the car in the rear driver's seat. And that another guy whose name he does not know was in the driver's seat. Daniel states that he has seen the driver around the neighborhood.

***

17

Daniel states that he knows Eduardo and Magic are members *** of the Latin Kings gang. And thinks the other guy might be, but he's not sure. Daniel states that he's not a gang member, but his friends were Latin Kings. Daniel states that a rival gang of the Latin Kings is the Two-Six gang, which is also known as bunnies. Daniel states that he can tell the difference between a King and a Two-Six because a King wears his hat to the left and a Two-Six wears his hat to the right.

Daniel states that he got into the car behind the co-pilot seat and Eduardo … got in the co-pilot seat. Daniel states that they drove over to … Springfield Street to see a … friend of Eduardo's, but they never found the friend. Daniel states that at some point Magic said they should go to Two-Six territory and see what's down there. Daniel states that Eduardo cut the gun, meaning to place a bullet in the chamber, gave the gun to Daniel, and said it's ready. Daniel states that when Eduardo did this, Daniel understood that to mean he was to shoot a ***Two-Six.

Daniel states they started going east on 30th in the direction of Pulaski, they saw a guy with a black sweat shirt *** on and they knew he was a Two-Six because his hat was turned to the right. And they were in Two-Six territory. Daniel states that the guy was standing on the left on the sidewalk and a girl was walking up to him. Daniel states that as they came on the guy, Eduardo said there's one. Daniel states that he understood that to mean the guy on the sidewalk was a Two-Six member. Daniel states that all the windows on the car were down, but the driver's window was covered with plastic. Daniel says they drove by the guy, but Daniel did not shoot.

Daniel states that Eduardo told him he should have shot at the guy. Daniel states that as they drove around the block and came back to where the guy and the girl were

standing together on the sidewalk, that Daniel reached across the car *** in front of Magic and pointed the gun out the *** back driver's side window and shot at the guy three or four times. Daniel states that the car was stopped when he shot the gun. Daniel states that they left and drove to Drake Street which is King territory.

Daniel states that they went back to his house and he … and Eduardo went inside his house and Eduardo put the gun back in the cabinet. Daniel states that the other two guys left in the car. Daniel states that he and Eduardo went to Drake to drink beers. Daniel states that the next day he was watching the news on the Spanish channel and saw that a girl had been shot the night before on Karlov and 30th. And he then knew that he had shot the girl instead of the guy. Daniel states that the news report also described the car as a green possible Chevy with plastic over one of the windows which was the car they were in. Daniel states that *** when he shot [at] the guy on the sidewalk, the guy did not have any weapons.

Daniel states that he's giving this statement freely and voluntarily and no threats or promises have been made to him in exchange for this statement. Daniel states he has been treated well by ASA Kent Delgado and the police. Daniel states that he has been offered food and drink and was able to use the bathroom if he wanted. Daniel states that he is free of any drugs or alcohol. Daniel states that he reviewed this statement as Detective Lopez read from the statement aloud in Spanish. Daniel states that he was afforded to make any corrections and additions he wanted. Daniel states that this is a true summary of what happened on December 17, 2002."

19

¶ 27      At the close of the State's evidence, defendant moved for a directed verdict, arguing that the State failed to prove its case beyond a reasonable doubt because defendant's statement was written in English when defendant spoke only Spanish. The court denied the motion.

¶ 28      Defendant did not present any evidence in his defense.

¶ 29      Following closing arguments and deliberations, the jury returned a verdict of guilty of first degree murder and aggravated discharge of a firearm and found that defendant personally discharged a firearm that proximately caused the death of Marilu Socha.

¶ 30      Defendant filed a motion for a new trial, arguing that the State failed to prove him guilty beyond a reasonable doubt, in part because "a statement written in a language that the defendant does not understand is not proof beyond a reasonable doubt"; the court should not have allowed the written statement to go back to the jury because the statement is unreliable as written in a language the defendant does not understand and because it was translated by the lead detective on the case; and the court allowed inadmissible hearsay concerning information the officers received from co-defendants.

¶ 31      The trial court denied defendant's motion for a new trial, finding that the evidence was sufficient to support the jury's verdict. The court found, in part, that because there was extensive cross-examination regarding defendant's statement, it was appropriate to send the statement back to the jury. Regarding defendant's hearsay complaint, the trial court said it "was very, very cautious to avoid the problem that he had that existed in the first trial. *** And at no time was anything like what happened at the first trial done here. There is no indication that any of the information that the police got during their investigation was obtained after talking to the co-defendants, which is really the problem in this case."

¶ 32      The court held a sentencing hearing, during which mitigation and aggravation evidence was presented, and the victim's father read a victim impact statement. At the close of the hearing, the court sentenced defendant to 45 years' incarceration for murder, plus a consecutive sentence of thirty-five years' incarceration "for the personal discharge of a weapon," and a consecutive sentence of 10 years' incarceration for aggravated discharge of a firearm.

¶ 33      Defendant appeals.

¶ 34                          II. ANALYSIS

¶ 35      On appeal, defendant first contends that he was denied a fair trial where the trial court allowed two police officers to testify to the substance of the co-defendants' statements implicating defendant as the shooter. Specifically, defendant alleges a *Bruton* violation, which prohibits the introduction of testimony that a nontestifying codefendant implicated the defendant in a crime. See *Bruton v. United States*, 391 U.S. 123, 137 (1968). He argues that the State improperly elicited, and the trial court erroneously allowed, hearsay from both Detectives Garcia and Lopez, thereby denying defendant his right to confront and cross-examine witnesses against him. According to defendant, the State's actions on retrial mirrored its actions at defendant's first trial for which this court reversed and remanded the cause for a new trial. The State responds that there was, in fact, no error; that the detectives' testimony was properly admitted for the limited purpose of showing the course of their investigation; and that any error that did occur was cured by the trial court's limiting of the testimony.

¶ 36      We note initially that defendant has properly preserved this issue for review by objecting at trial and including it in a posttrial motion. See *People v. Thompson*, 238 Ill. 2d 598, 611

(2010) ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion." (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988))).

¶ 37    Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). " '[T]estimony by a third party as to statements made by another nontestifying party identifying an accused as the perpetrator of a crime constitutes hearsay testimony and is inadmissible.' " *People v. Yancy*, 368 Ill. App. 3d 381, 385 (2005) (quoting *People v. Lopez*, 152 Ill. App. 3d 667, 672 (1987)). A co-defendant's statement incriminating a defendant is inherently unreliable, particularly when the co-defendant does not testify at trial and cannot be cross-examined. *Bruton*, 391 U.S. at 136.

¶ 38    To qualify as hearsay, an out-of-court statement must be offered to establish the truth of the matter asserted. *People v. Rodriguez*, 312 Ill. App. 3d 920, 928 (2000). The introduction of a co-offender's hearsay statement implicating the defendant violates the defendant's sixth amendment right to confrontation. U.S. Const., amend. VI; *Bruton*, 391 U.S. at 137; *People v. Gacho*, 122 Ill. 2d 221 (1988) (holding that it was permissible for a police officer to testify that after he spoke to the victim, he went to look for the defendant, but indicated that it would have been error to permit the officer to testify to the *contents* of that conversation). "The fundamental reason for excluding hearsay is the lack of an opportunity to cross-examine the declarant." *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004) (citing *People v. Shum*, 117 Ill. 2d 317, 342 (1987)); see also *Yancy*, 368 Ill. App. 3d at 385; *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009). "The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the

witnesses against him." (Internal quotation marks omitted.) *Crawford v. Washington*, 541 U.S. 36, 42 (2004). However, the Confrontation Clause does not bar statements that are offered for purposes other than the truth of the matter asserted, but concerns testimonial hearsay. *Crawford*, 541 U.S. at 59, n.9.

¶ 39    Admissibility of evidence is within the discretion of the trial court, and its ruling will not be reversed unless there has been an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001); *People v. Leak*, 398 Ill. App. 3d 798, 824 (2010).

¶ 40    Our supreme court has held that law enforcement officers "may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 154, 174 (1991). In addition, a law enforcement officer "may testify about his conversations with others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted by the other, but is used to show the investigative steps taken by the officer." *Simms*, 143 Ill. 2d at 174; *Jura*, 352 Ill. App. 3d at 1085 (statements are not inadmissible hearsay when they are offered for the limited purpose of showing the course of a police investigation, but only where such testimony is necessary to fully explain the State's case to the trier of fact). "Testimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant." *Simms*, 143 Ill. 2d at 174. " '[O]ut-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information.' " *People v. Boling*, 2014 IL App (4th) 120634, ¶ 107 (quoting *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (1992)); *In re Jovan A.*, 2014 IL App (1st)

103835, ¶ 35 (under this exception, "an officer may not testify to information beyond what is necessary to explain his or her actions").

¶ 41     Accordingly, a police officer may testify about a conversation that he had with an individual and his actions pursuant to the conversation to recount the steps taken in his investigation of the crime, and such testimony will not constitute hearsay, since it is not being offered for the truth of the matter asserted. *People v. Hunley*, 313 Ill. App. 3d 16, 33 (2000) (citing *People v. Pryor*, 181 Ill. App. 3d 865, 870 (1989)). However, the police officer may not testify to information beyond what was necessary to explain the officer's actions. *Jura*, 352 Ill. App. 3d at 1085; *Hunley*, 313 Ill. App. 3d at 33. As such, our courts have repeatedly held that the State may not use the limited investigatory procedure exception to place into evidence the *substance* of any out-of-court statement that the officer hears during his investigation, but may only elicit such evidence to establish the police investigative process. See *Hunley*, 313 Ill. App. 3d at 33-34; *Jura*, 352 Ill. App. 3d at 1085; see also *Gacho*, 122 Ill. 2d at 248 (it was permissible for a police officer to testify that after he spoke to the victim he went to look for the defendant, but court indicated that it would have been error to permit the officer to testify to the *contents* of that conversation); *People v. Jones*, 153 Ill. 2d 155, 160 (1992); *People v. Johnson*, 202 Ill. App. 3d 417, 421-22 (1990). We explained the rationale for this principle in *People v. Trotter*, 254 Ill. App. 3d 514, 527 (1993):

       "[T]here is a distinction between an officer testifying to the fact that he spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation. [Citation.] Under the investigatory procedure exception, the officer's testimony must be limited to show how the investigation was conducted, not to

place into evidence the substance of any out-of-court statement or conversations for the purpose of establishing the truth of their contents. [Citation.] The police officer should not testify to the contents of the conversation [citation], since such testimony is inadmissible hearsay. [Citation.]" *Trotter*, 254 Ill. App. 3d at 527.

¶ 42 We now turn to the case at hand, and consider whether the court erred in allowing the detectives' testimony.

¶ 43 The specific testimony with which defendant takes issue is the following testimony by Detective Garcia:

"[ASA LYNCH:] Q. After these line-ups, Simon and Bentazos were still in custody at Area 4, correct?

[DETECTIVE GARCIA:] A. Yes.

Q. After dealing with Bentazos and Simon, what did you do next in this investigation?

A. We obtained information of two additional offenders.

[ASSISTANT PUBLIC DEFENDER CHRISTL:] Objection.

THE COURT: Sustained. Disregard that answer, ladies and gentlemen."

Defense counsel requested a sidebar, which the court granted outside of the hearing of the jury. Following the sidebar, the court admonished the jury:

"[THE COURT:] Ladies and gentlemen, you are to disregard the last question and answer."

The court also admonished Detective Garcia not to mention the fact that he had any conversations with Simon and Bentazos. The following testimony then transpired:

"[ASA LYNCH:] Q. After these line-ups, Detective, what is the next thing you did in your investigation?

[DETECTIVE GARCIA:] A. We—we had information on two additional persons.

[ASSISTANT PUBLIC DEFENDER CHRISTL:] A. Objection.

THE COURT: Disregard that question and that answer. Ask your next question.

[ASA LYNCH:] Q. What is the next thing you did in this investigation?

A. We were looking for two other subjects.

Q. What information did you initially have about these two subjects?

A. We had nicknames.

Q. What were the nicknames?

A. One by the name of Chilango (phonetic) and the other by the name of Spook."

¶ 44    Defendant also takes issue with the following testimony by Detective Lopez:

"[ASA HOLLAND:] Q. When that investigation was turned over to you was anybody in custody for that murder at area four?

[DETECTIVE LOPEZ:] A. Yes, sir.

Q. Who was that?

A. Mr. Bentazos and Mr. Simon.

Q. And when the investigation was turned over to you, did you look for any additional offenders besides the two in custody?

A. Yes.

Q. Who were you looking for?

A. Torres and a subject by the name of Chilango.

Q. And did Eduardo Torres also have the nickname of Spook?

A. He did, yes.

Q. Did you and Detective Schleder take steps that evening and the night of December 18th to try and locate Eduardo, Spook, Torres?

A. Yes, sir.

Q. Were you successful that evening?

A. No, not at that time.

Q. Did you share any information with uniformed officers in the district that comprised area four?

A. Yes, with the tenth district, correct.

Q. And specifically what did you share with them?

A. Eduardo Torres's IR number, his internal record number, his description, and that was passed along to the beat officers.

Q. And did you and Detective Schleder attempt to develop information on Chilango?

A. Yes.

Q. Were you still working just after midnight and into the morning on December 19th 2002?

A. Yes, I was.

Q. Did you learn that Torres was arrested at 12[:]10 a.m. on December 19th on the street at 2501 South Drake by uniformed officers?

A. Yes.

Q. And was Eduardo Torres subsequently brought to area four [police station]?

[DETECTIVE LOPEZ:] A. He was.

Q. Did you continue your investigation into Marilou's murder at that time?

A. Yes.

Q. Did you have an opportunity to leave area four at [3:45 that morning?]

A. Yes.

Q. When you left area four were you going to a specific location?

A. Yes.

Q. Where were you going?

A. The tenth district 2448—the 2400 block of south Spaulding I believe it was.

Q. Okay, did you subsequently relocate to 2442 South Saint Louis, first floor?

A. Saint Louis, yes, sir.

Q. Okay. And were you looking for a specific person at that address?

A. Yes, sir.

Q. Who were you looking for?

A. Male, Hispanic by the—with the nickname of [Chilango] or [Beto].

Q. And did you have any other identifiers of that individual?

A. Medium height 5 6 with a tattoo on his arm.

[ASSISTANT PUBLIC DEFENDER CHRISTL:] Yes, sir. [*sic*]

THE COURT: Basis.

[ASSISTANT PUBLIC DEFENDER CHRISTL:] Hearsay.

THE COURT: Overruled.

[ASA HOLLAND:] Q. You may continue.

[DETECTIVE LOPEZ:] Q. That was the approximate description."

¶ 69    The State first argues that the challenged statements by the detectives were not hearsay because they were not offered for their truth, but to explain police investigative procedure. Defendant argues that the testimony at the second trial was nearly identical to that at the first trial and, therefore, the same reversible error occurred.

¶ 70    In defendant's first trial, the State asked Detective Garcia if codefendants Simon and Bentazos were at the police station, prompting the following exchange:

" '[DETECTIVE GARCIA:] A: Yes, they were, ma'am.

[STATE:] Q: Were interviews conducted in the late night hours of December 17th and the early morning hours of December 18, 2002?

A: Yes, they were.

Q: After interviews were conducted, did your investigation continue?

A: Yes, it did, ma'am.

Q: Where you looking for any other offenders in this shooting?

A: Yes, due to our interviews with Mr. Simon and Mr. Bentazo, we were able to obtain two nicknames also involved in the shooting which they gave us so—

DEFENSE COUNSEL: Judge, objection.

THE COURT: Sustained. Rephrase your question. The question asked of the Detective and the answer will be stricken.

STATE: A: After interviews were conducted were you looking for any other offenders or possible offenders?

29

DETECTIVE GARCIA: A: Yes, we were looking for two subjects. One by the *** street name of Chilango." []Chilango was later determined to be defendant.' " *People v. Ochoa*, No. 1-05-1848 (2007) (unpublished order under Supreme Court Rule 23).

¶ 71    Additionally, in the first trial, Detective Lopez testified:

" 'STATE: Q: Did you see Eduardo Torres when he was brought to Area 4 in the early morning hours of December 19, 2002?

DETECTIVE OPEZ: A: I did.

Q: Did your investigation continue into the homicide of 15 year old Marila Soscha [*sic*] at this point?

A: Yes.

Q: Were interviews conducted?

A: Yes.

Q: After interviews were conducted at approximately 3:30 to 3:45 A.M. still on December 19, 2002, did you have occasion to leave Area 4?

A: Yes.

Q: When you left Area 4, were you going to a specific location?

A: Yes. We were directed to 2442 South St. Louis on the first floor.

Q: When you say you were directed to 2442 South St. Louis on the first floor, were you specifically looking for someone at that address?

A: Yes. I was looking for a male Hispanic named Chilango who also went by— who also had a first name of Alberto who was a male Hispanic approximately five-

six, medium build, with a tattoo on his arm that said Beto.' "*People v. Ochoa*, No. 1-05-1848 (2007) (unpublished order under Supreme Court Rule 23).

¶ 72    On review, this court found reversible error:

"We find that the detectives' testimony was inadmissible hearsay. The State repeatedly elicited testimony that contained a strong inference that the co-defendants implicated defendant in their statements. This exchange went beyond mere questioning concerning the investigatory process, and included serial questions to build the inference that defendant was named by his criminal cohorts. Furthermore, rather than limiting testimony to the actions within the investigatory process, the jury was told that, after interviewing co-defendants at the police station, police knew the defendant's home address, his first name, his nickname, his ethnicity, height and build, and that he had a very specific tattoo. This testimony was inadmissible hearsay, as it went beyond the mere steps that the police took in their investigation, and instead placed into evidence the substance of the co-defendants' out-of-court statements for the purpose of establishing their truth. See *Jura*, 352 Ill. App. 3d at 1085; *Trotter*, 254 Ill. App. 3d at 527. Moreover, the State reinforced this evidence by reminding the jury multiple times during closing arguments that, after police interviewed the co-defendants, they knew they were looking for a person with the precise characteristics of defendant. The reasonable inference to be drawn by the jury was that this information came from the co-defendants." *People v. Ochoa*, No. 1-05-1848 (2007) (unpublished order under Supreme Court Rule 23).

¶ 73    A very similar scenario played out in the courtroom during defendant's second trial. Again, the police were allowed to testify to the substance of the statements apparently

31

obtained from defendant's co-defendants. Detective Garcia testified that, after interviewing people at the scene of the crime and talking to police, he went to the Area 4 police station, where Bentazos, Simon, and Argueta were in custody. The State asked: "After dealing with Bentazos and Simon, what did you do next in this investigation?" And Detective Garcia answered, "We obtained information of two additional offenders." Defense counsel objected, the objection was sustained, and the court instructed the jury to disregard the answer. Defense counsel also moved for a mistrial, which motion was denied.

¶ 74    Upon resuming questioning, the State asked Detective Garcia, "After these line-ups Detective, what is the next thing you did in your investigation?"[12] Detective Garcia answered, "We—we had information two additional persons." The court again sustained defense counsel's objection and ordered the jury to disregard that question and answer. The State then asked, "What is the next thing you did in this investigation?" Detective Garcia answered, "We were looking for two other subjects." The State then elicited, with no objection, that the detectives then were looking for a person nicknamed Chilango and a person nicknamed Spook. This series of questions and answers established that "after dealing with" the co-defendants, Detective Garcia then had specific identifying information about defendant. The State also elicited the fact that Spook was Eduardo Torres and that the police never developed any evidence pointing to Ricardo Argueta being an offender in this case. From this testimony, then, the jury learned that, after talking with the co-defendants, the police were then looking for a suspect nicknamed "Chilango." It was never disputed at trial that defendant's nickname was Chilango.

---

[12]During earlier questioning of Detective Garcia, the State had established that co-defendants Simon and Bentazos were both "participants in that line-up."

32

¶ 75      Regarding Detective Lopez' testimony, he testified that, when the case was turned over to him on December 18, 2002, both Bentazos and Simon were in custody. He testified that he and his partner proceeded to look for two "additional offenders," one of whom was Torres and the other a "subject by the nickname" of Chilango. At 12:10 in the morning of December 19, 2002, co-defendant Torres was arrested and brought to the Area 4 police station. Lopez testified that he continued his investigation into the murder, and that, at 3:45 that morning, he left the police station to go to a 2442 South St. Louis, first floor. He went to that location looking for a "[m]ale, Hispanic" with the nickname of Chilango, who was medium height, 5 foot, six inches, with a tattoo on his arm. Defense counsel's objection to these specific identifiers was overruled by the trial court. Later in his testimony, Detective Lopez testified that "Chilango" is a nickname for somebody from Mexico City. Detective Lopez proceeded to testify that, when he went to the building at South St. Louis, defendant answered the door and identified himself as Daniel Alberto Ochoa, said his nickname was Chilango, and confirmed that he lived at that address. From this testimony, the jury learned that co-defendant Torres was brought to the police station and, very soon thereafter, Detective Lopez knew to search for a specific individual with defendant's specific identifiers of nickname, height, build, ethnicity, gender, and tattoo. The jury could easily infer from this series of questions that co-defendant Torres implicated defendant in the crime.

¶ 76      We find that the detectives' testimony here was inadmissible hearsay. The State repeatedly elicited testimony with the strong inference that defendant's co-defendants implicated him to the police. The jury witnessed this exchange, which went beyond mere questioning concerning the investigatory process and, like in the first trial, included serial questions to build the inference that defendant was named by his criminal cohorts. Testimony regarding

the steps of an investigation may not include the substance of a conversation with nontestifying witnesses. *Gacho*, 122 Ill. 2d at 248; *Jones*, 153 Ill. 2d 160; *Johnson*, 202 Ill. App. 3d at 421-22. Again, as in the first trial, this testimony was in no way limited to the actions police took as part of their investigatory process, but instead the jury was informed that, with co-defendants Simon, Bentazos, and Torres at the police station, the detectives discovered the defendant's home address, nickname, gender, ethnicity, height and build, and information about his tattoo.

¶ 77    We also agree with defendant that there is no material difference between the substantive contents of the detectives' testimony between defendant's first and second trials. This testimony went beyond the parameters of the investigatory procedure exception. See, *e.g.*, *Boling*, 2014 IL App (4th) 120634, ¶ 107 (" '[O]ut-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information.' " (quoting *O'Toole*, 226 Ill. App. 3d at 988)); *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 35 (under this exception, "an officer may not testify to information beyond what is necessary to explain his or her actions"). The State's evidence did not simply relay to the jury what investigatory steps were taken by the police (*i.e.*, that Simon and Bentazos were arrested, that Torres was arrested the following day, and that defendant was arrested later that day). Instead, the reasonable inference to be drawn by the jury from the information provided at trial was that defendant's co-defendants implicated him in the crime.

¶ 78    We note here that, again like the first trial, the State reinforced this evidence by reminding the jury during closing arguments that defendant's co-defendants had implicated

him in the crime. In discussing defendant's inculpatory statement to the police, the prosecutor told the jury:

"[ASA HOLLAND:] And you know why he gave it [the inculpatory statement] up as soon as he sat down with Sergeant Lopez? He gave it up because he knew the game was over. He knew the three co-defendants were in custody at that station. He knew the police—

[DEFENSE COUNSEL:] Objection.

THE COURT: Overruled.

[ASA HOLLAND]: Had solved this crime. And you know what? He knew at that point there was no reason to deny it. You heard from Sergeant Lopez, he didn't deny it. He started talking immediately."

In our opinion, this statement to the jury linked the reason defendant allegedly provided an inculpatory statement to the fact that his co-defendants had already been arrested and were in custody upon his arrival to the station, and it provided further reason for the jury to infer that the information obtained by police—including defendant's gender, ethnicity, nickname, build, and home address—was provided to them by the co-defendants.

¶ 79    We find *People v. Boling*, 2014 IL App (4th) 120634, instructive here, where the Fourth District of this court discussed the nature of the investigatory procedure exception and its origins, noting:

"In *People v. Cameron*, 189 Ill. App. 3d 998, 1004, 546 N.E.2d 259, 263 (1989), this court discussed the theory upon which out-of-court statements are admitted to explain a course of police conduct and the danger of misuse of such statements, as follows:

' "In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted 'upon information received,' or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great." ' [*Cameron*, 189 Ill. App. 3d at 1004] (quoting Edward W. Cleary, McCormick on Evidence § 249 (3d ed. 1984)).

See also *People v. Rice*, 321 Ill. App. 3d 475, 482, 747 N.E.2d 1035, 1041 (2001) ('The reality is that it will almost always be possible to describe testimony revealing the content of conversations with the police as evidence offered to shed light on the investigation of the crime rather than on the crime itself. If reviewing courts allowed the mere invocation of the words "police procedure" to preclude further analysis, this limited exception would effectively swallow the hearsay rule with regard to police officers. The compelling protections that gave rise to the hearsay rules must not be so easily discarded.'); Michael H. Graham, Graham's Handbook of Illinois Evidence § 801.5 (10th ed. 2010) ('This limited admissibility of investigatory background *** is still nevertheless unfortunately overly broad. Investigatory steps taken by a police officer are rarely more than marginally relevant at best, while the risk of jury misuse of the information at great expense to the accused is substantial.')." *Boling*, 2014 IL App (4th) 120634, ¶ 108.

We take this cautionary advice to heart, and acknowledge that the testimony here, which indicated that the co-defendants implicated defendant in the crime, was overly broad and reached outside the protective boundaries of the investigatory procedure exception.

¶ 80        The State urges that, even if any error occurred here, it was cured when the trial court instructed the jury to disregard two out of Detective Garcia's three statements that he was looking for additional offenders. We disagree. First, even if this instruction could have cured the error, Detective Garcia was questioned a third time in the same manner and his answer was not stricken, and, additionally, none of Detective Lopez' testimony was stricken.

¶ 81        Second, the court did not provide a limiting instruction. When investigative procedure evidence is admitted at trial, the court "must instruct the jury that the testimony was introduced for the limited purpose of explaining what caused the police to act and that [the jury] were not to accept the statement as true." *Trotter*, 254 Ill. App. 3d at 527. Absent a limiting instruction, it cannot be presumed that the jury's use of hearsay evidence was limited to a nonhearsay purpose. *Trotter*, 254 Ill. App. 3d at 528; *Jura*, 352 Ill. App. 3d at 1093. Here, rather than give a limiting instruction, the court sustained defense counsel's objection to Detective Garcia's testimony that "We obtained information of two additional offenders," and instructed the jury to "disregard the last question and answer." Then, when Detective Garcia testified that, after the line-ups, he "had information two additional persons," the court again instructed the jury to disregard that question and that answer. Then, Detective Garcia testified that he and his partner looked for "two subjects named Chilango and Spook." Contrary to the State's interpretation of the record, we see no limiting instruction given by the court. Instead, the court instructed the jury to disregard on two occasions. Then, in its instructions to the jury prior to deliberations, the court instructed the jury that "Any evidence

that was received for a limited purpose should not be considered by you for any other purpose." Because no limiting instruction was given here, we do not presume that the jury's use of the evidence was limited to a non-hearsay purpose.

¶ 82    Our inquiry, however, does not end here. Inadmissible hearsay does not require reversal where there is no reasonable probability the jury would have found the defendant not guilty had the hearsay been excluded. *Jura*, 352 Ill. App. 3d at 1089. "The remedy for erroneous admission of hearsay is reversal, unless the record clearly shows that the error was harmless." *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 37. "When examining whether the admission of hearsay was harmless, reviewing courts must ask whether there is a reasonable probability that the trier of fact would have acquitted the defendant had the hearsay been excluded." *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 37 (citing *People v. Warlick*, 302 Ill. App. 3d 595, 601 (1998)).

¶ 83    Based on the record before us, we see no such probability. Instead, we find that the use of the inadmissible hearsay was not harmless because, once we eliminate the inference provided the jury that defendant's co-defendants implicated him in the crime, the only evidence connecting defendant to the crime is his inculpatory statement. This statement was taken in English although defendant speaks only Spanish. It was translated by the investigating detective, who had no official certification to be a translator; who was, as stated, the detective assigned to investigate the crime; and who admitted at trial that, although he reads Spanish well, his "grammar is poor in both English and Spanish," and had studied Spanish in college for a single year. The balance of the evidence admitted at trial pertained only to the co-defendants and not to defendant. At trial, defendant was linked to the crime by two things: the detectives' testimony that they were seeking an additional suspect with defendant's

precise descriptors (*e.g.*, a five-foot, six-inch tall tattooed Hispanic man nicknamed Chilango who lived on the 2400 block of South St. Louis), and his statement. Without the inadmissible hearsay evidence regarding defendant's description, the only evidence left linking defendant to the crime is defendant's troubling foreign-language confession made with no official translator, but instead translated by the investigating detective on the case. On this evidence, we are bound to reverse because there is a reasonable probability that, had the improper hearsay testimony been excluded, the jury would have found defendant not guilty. Accordingly, because this error was not harmless, we remand this cause for a new trial. See *Jura*, 352 Ill. App. 3d at 1089.

¶ 84    Throughout the trial, the court was aware of our previous Order in this cause and the issues therein and tried to guide the State to avoid the introduction of hearsay. For example, the court granted defendant's motion *in limine* asking the court, in part, to exclude "inadmissible hearsay evidence inferring the co-defendants' identification of defendant." In granting that motion, the court specifically instructed the State to "walk around very carefully at the time the two witnesses, [Detective] Lopez and [Detective Garcia] are on the stand." Then, in discussing the motion for a mistrial, made during Detective Garcia's testimony, the court again told the State to "simply ask [Detective Garcia] what was the next thing they did in their investigation that night and move on from there and do not go anywhere near conversations." The court also admonished Detective Garcia to avoid testifying that he had any conversations with Simon and Bentazos. We are nonetheless compelled to conclude that, despite the court's best efforts to limit the State's repeated attempts to push the boundaries of the investigative procedure exception, the evidence ultimately admitted at trial and presented to the jury did not fall under the investigative procedure exception and constituted hearsay.

This evidence linking defendant to the crime was so crucial to the State's case that its admission prejudiced defendant. See *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 37. We therefore reverse defendant's conviction and remand this cause for a new trial. For this reason, we do not address the merits of defendant's other arguments herein.

¶ 85    On remand, we instruct the State to use more caution in its examination of the detectives such that the detectives' testimony does not bolster the State's case against defendant. The State should understand more fully the strictures of the investigatory procedure exception and should steer clear of any testimony that goes beyond an officer "reconstruct[ing] the steps taken in a crime's investigation" and "describ[ing] the events leading up to the defendant's arrest where such testimony *is necessary and important to fully explain* the State's case to the jury," being mindful that "there is a distinction between an officer testifying to the fact that he spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation." (Emphasis added.) *Trotter*, 254 Ill. App. 3d at 527.

¶ 86                                III. CONCLUSION

¶ 87    For all of the foregoing reasons, we reverse and remand for a new trial.

¶ 88    Reversed and remanded.