2019 IL App (1st) 150331-U

Nos. 1-15-0331; 15-0332 (cons.)

Order filed November 14, 2019

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | Nos. 11 CR 13366 |
| | ) | 11 CR 13370 |
| | ) | |
| DAQUISE REDDICK, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's convictions for armed robbery and attempted robbery are affirmed where the State sufficiently proved the *corpus delicti* of the attempted robbery offense, and the State did not make improper remarks during its rebuttal closing argument. While the trial court erred in allowing into evidence the contents of two phone calls and the caller identification readouts from those calls, the error was harmless given the overwhelming evidence of defendant's guilt for both offenses.

¶ 2    Following a jury trial, defendant Daquise Reddick was found guilty of armed robbery and attempted robbery in two separate, but joined, cases. The trial court sentenced him to concurrent terms of seven years' imprisonment for the armed robbery and three years' imprisonment for the attempted robbery. On appeal, defendant contends that: (1) the State failed to sufficiently prove the *corpus delicti* of the attempted robbery offense; (2) the trial court improperly allowed the State to admit into evidence the contents of two phone calls and the caller identification readouts from those calls; and (3) the State made improper remarks during its rebuttal closing argument. For the reasons that follow, we affirm defendant's convictions.

¶ 3                                    I. BACKGROUND

¶ 4    In Case No. 11 CR 13366, a grand jury indicted defendant and codefendants, Travis Drayton and Jamal Drayton, with one count of armed robbery alleging that, on July 18, 2011, they used, or threatened the imminent use of, pepper spray to take a bag from Myckol Shamble. In Case No. 11 CR 13370, a grand jury indicted defendant and codefendants with three counts of attempted robbery and two counts of attempted burglary that also allegedly occurred on July 18, 2011. However, from that indictment, the State proceeded to trial on only one count of attempted robbery, wherein defendant and codefendants allegedly attempted to break a window of a Family Dollar store while Crystal Robinson was inside by the use of force or threatening the imminent use of force with the intent to commit a robbery therein. Prior to trial, Travis pled guilty to one count of robbery and one count of attempted robbery. Jamal also pled guilty, though it is unclear from the record to what offenses. Both of defendant's cases were tried together.

¶ 5                                    A. Trial Evidence

¶ 6    At defendant's jury trial, the State presented the testimony of Travis, Shamble and Robinson as well as multiple Calumet City police officers. The State's evidence showed that, in

the morning of July 18, 2011, Travis and Jamal, who were cousins, were hanging out at Travis' house. During that time, Travis heard Jamal making phone calls, but he could not hear to whom Jamal was talking. Later in the day, they drove to Calumet City in the car of Jamal's girlfriend. Travis was in the passenger seat while Jamal drove. Although Travis did not know initially what they were going to do once they reached Calumet City, at trial, he testified that the reason they went there was "because Jamal was going to get some money." When asked by the State whether that meant Jamal was going to "[s]teal it from someone," Travis responded "[y]es." Jamal ended up parking in an alley behind a Family Dollar store. After Jamal parked the vehicle, he exited, and Travis moved over into the driver's seat. However, during cross-examination, Travis testified that, when Jamal exited the vehicle, Jamal had not told him what he was going to do.

¶ 7    Around 3:15 p.m. that day, Shamble was working at a Family Dollar store in Calumet City, where she was the manager and defendant was an employee. Defendant was working that afternoon. As part of Shamble's daily duties, she would drive to the bank to exchange petty cash for coins, and sometimes she would have deposit slips. This day, she gathered up the store's petty cash and put the cash in an envelope, which she placed in her pocket. Around the time she was collecting the petty cash, she noticed defendant walk to the door and look outside with a cell phone multiple times. As Shamble left the store and walked to her car in the parking lot, she carried a lunch bag with a strap, which she used to carry the coins back from the bank. After Shamble entered her vehicle, someone approached her, sprayed her face with mace and took the lunch bag. Although she could not see the face of the individual, she could tell that it was a "brown skinny guy" wearing a do-rag and white tank top. At trial, she testified that she had seen this man loitering outside of the store by himself about 15 minutes before he sprayed her with mace. She even told him he could not loiter in the area, but she never called the police. A

customer was nearby and helped walk Shamble, who could not see, back to the store. One of the store's employees then called the police. Shamble did not observe defendant leave the store during the attack and believed his shift ended around 4 or 4:30 p.m. that day.

¶ 8     When Jamal returned to his girlfriend's vehicle, Travis noticed that he was carrying a lunch bag with a strap. Jamal opened the bag, but there was nothing inside. As Travis drove off, Jamal threw the bag out the window, and they went to back to Travis' house. At some point in the day, though after they parked near the Family Dollar, Travis noticed that Jamal had pepper spray on his key chain. After staying at Travis' house for a couple hours, Jamal received a phone call, but Travis could not hear to whom Jamal was talking. About an hour later, they drove to South Holland and picked up defendant, someone that Travis did not know. The group then drove to the same Family Dollar in Calumet City, again parking in the alley behind the store. Defendant and Jamal exited the vehicle, and Travis moved over to the driver's seat. Travis did not see defendant with any sort of clothing to cover his face.

¶ 9     Around 9 p.m., Robinson was working at the Family Dollar store in Calumet City and two other employees were present. Because the store closed around this time, one of them locked the front door. As Robinson began counting the cash from the cash register, she noticed two people throwing objects at the glass door. She believed they were trying to break the door down. The glass door was "very, very close" to her, and she looked toward the individuals only briefly. The glass door cracked, but did not completely shatter. At trial, she described the two people as wearing black jogging clothes and possibly wearing scarves around their mouths, though she could not describe the scarves. Robinson subsequently ran to the back of the store and called the police. At trial, the State admitted photographs of the glass door, which showed the door cracked in multiple locations and multiple brick-like objects on the ground.

¶ 10     Meanwhile, Travis had remained inside the vehicle parked behind the store and noticed that Jamal had left his cell phone. After defendant and Jamal failed to return to the car after some five minutes, Travis drove through the alley behind the store and turned onto a side street where he observed the police. The police immediately pulled him over and he was detained while the police investigated him. At trial, Travis acknowledged pleading guilty to robbery and attempted robbery in exchange for receiving a recommendation for boot camp from the State, but he denied any agreement to testify against defendant for the recommendation.

¶ 11     Calumet City Police Officer Hatchett, who had responded to a call of a robbery in progress, was the officer who pulled Travis's vehicle over.[1] As another officer detained Travis, Officer Hatchett searched the vehicle. Inside, Officer Hatchett found a wallet containing an identification card for Jamal and a cell phone. During the search, the cell phone rang, and at trial, Officer Hatchett testified over defense counsel's objection that the caller identification listed the caller as "Quise." Officer Hatchett answered the phone and a male voice stated "cuz where you at? Is it hot over there?" Officer Hatchett responded "naw." At this point in Officer Hatchett's testimony, defense counsel objected and made a continuing objection to any testimony about Officer Hatchett's phone conversation. The trial court, however, overruled the objection and stated "this just goes to the officer explaining why he eventually does what he does."

¶ 12     Officer Hatchett continued testifying and stated that the male voice told him "we're on 159th and State Line. Come pick us up." Officer Hatchett subsequently provided information over the police radio and then drove to that location, but he did not observe anyone in the area. The cell phone rang a second time, again from "Quise," and he believed the same male voice from before said "[m]eet us at the gas station on Homan." Officer Hatchett again provided

---

[1] Officer Hatchett did not testify to his first name.

information over the police radio and then drove to the gas station. Once he arrived, he observed Jamal and defendant, and both attempted to run away. Officer Hatchett was able to apprehend Jamal, and another officer was able to apprehend defendant. Officer Hatchett searched Jamal for weapons and found a can of mace. The police called Robinson and asked her to come to the gas station, which she did. There, Robinson identified defendant as one of the people throwing objects at the glass door and as an employee of the store. She recognized defendant as one of the individuals throwing the objects based on his clothing, his eyes, nose and skin color.

¶ 13     Calumet City Police Detective Mitch Growe, one of the lead investigators into the various crimes at the Family Dollar store, initially interviewed Travis. Later, along with another detective, Detective Growe talked with defendant. After Detective Growe advised defendant of his *Miranda* rights and confirmed that defendant understood those rights, defendant signed a form indicating the same. Defendant subsequently spoke to the detectives and gave an oral statement. Detective Growe transcribed the statement and read it back to defendant, who was allowed to make any changes but he chose not to. Defendant then signed the statement. At trial, the State published the statement to the jury and admitted it into evidence.

¶ 14     In the statement, defendant remarked that he had worked at the Family Dollar for eight months and was told he was going to be promoted to assistant manager, but the promotion never happened. In fact, he stated the store actually cut his hours, which made him "very angry." As a result, defendant "came up with an idea to rob" the store and contacted Jamal. Defendant stated he told Jamal that "on Mondays during the day shift the manager leaves the store to drop off money at the bank." Ultimately, on July 18, 2011, Jamal was "waiting" outside the store for "the manager to leave." When she did, Jamal approached her, sprayed her with mace, grabbed a bag she was carrying and ran. But defendant later learned that the bag did not have any money in it.

Defendant claimed he told Jamal not to use any weapons and he did not know Jamal was going to use mace. After being unsuccessful, defendant and Jamal "talked" and "decided to come back right before closing to rob the store." Travis picked defendant up, and all three of them went back to the Family Dollar store, eventually parking behind the store. Jamal and defendant exited the vehicle and walked to the front of the store. Defendant, however, stated he got "cold feet" and was walking away when Jamal threw a brick at the door. They ran from the store, and a short time later, Jamal called Travis to have Travis pick them up. Eventually, the police arrested them. Defendant stated he only did this to help his parents "pay some bills" and knew it was wrong.

¶ 15    Approximately two weeks later, Shamble went to the Calumet City police station, viewed a lineup and identified the second individual in the lineup. According to Detective Growe, Jamal was the second individual in the lineup.

¶ 16    Defendant did not testify or present any evidence on his behalf.

¶ 17                                B. Closing Arguments

¶ 18    In the State's closing argument, it highlighted defendant's confession to the police and argued that the evidence showed he was upset that he did not receive a promotion at work. The State posited that, as a result, he devised a plan to rob the store, first by enlisting Jamal to rob Shamble who would be carrying the store's money and then, when the initial plan failed, devised a second plan to go after the store itself around closing time. The State contended that its evidence proved defendant was guilty of armed robbery and attempted robbery.

¶ 19    Defense counsel responded, arguing that defendant's statement to the police was not a confession and was not voluntarily made by him. As support, defense counsel highlighted the statement and argued that it lacked critical details of how the alleged plan to rob Shamble or the store came to be. Defense counsel concluded that, because defendant's alleged confession lacked

so many important details, the statement was "concocted" by "the police." To this end, defense counsel asked "[w]ho prepared" the confession and answered "[o]nly Detective Growe." Defense counsel further pointed to Travis' testimony and noted that he never testified to any planning of a robbery. Defense counsel also attempted to undermine the State's motive and noted that neither Robinson nor Shamble testified to defendant being passed up for a promotion or criticized his work performance. Additionally, defense counsel assailed the identification by Robinson and observed that, before she identified defendant at the gas station, she never indicated to the police that he was involved. In imploring the jury to find defendant not guilty, defense counsel asserted the evidence simply did not show he "planned and facilitated" the alleged crimes.

¶ 20    In the State's rebuttal, it asserted that defendant was the central figure in both crimes, as he was the only reason Jamal would know the right time to rob Shamble and the right time to go back to the store when it was closing. In attempting to support the assertion that Jamal could not have committed the armed robbery of Shamble without defendant's help, the State remarked "[h]ow does Jamal Drayton know that she's the manager? How does he know that what she's carrying is supposed to be a bag for the bank? How does he know she's even on the way to the bank? How does he know those things *** if this defendant didn't tell him?" The State added "[t]here's no evidence that Jamal even ever went inside that store, that he knew anyone else that worked there. There's no evidence of any of that." Regarding the attempted robbery, the State stated that "[t]here's no evidence that Jamal Drayton knew" what time the store closed. And "[t]here's no evidence that he had been there before." At this point, defense counsel objected, but the trial court overruled the objection, instructing the jury that "what the lawyers say is not evidence" and to "use your collective memory as to what the evidence is."

¶ 21    Later in its rebuttal argument, the State responded to defense counsel's claim about the reliability of defendant's confession and remarked "part of counsel's theory appears to be that this statement is a fabrication by Detective Growe, that somehow a grand conspiracy evolved." At this point, defense counsel objected, but the trial court overruled the objection finding it was proper argument. The State continued and stated that defense counsel's theory was that "a grand conspiracy evolved to frame this defendant for this crime. Where is there evidence of that? Where is there evidence that Detective Growe had even met this defendant?" In concluding its rebuttal argument, the State observed that it had "the burden of proving everything beyond a reasonable doubt, and that's a high burden. I'm not going to stand here and tell you that it's not. But it's not beyond all doubt. It's not an impossible burden. It is a burden that's met day after day in courtrooms across this country." At this point, defense counsel objected "to what happens in other courts," but the trial court overruled the objection.

¶ 22                          C. Verdict, Sentencing and Posttrial

¶ 23    After deliberations, the jury found defendant guilty of armed robbery and attempted robbery. Defendant filed a motion for new trial, arguing in part that the evidence was insufficient to convict him and the trial court "erred in overruling Defendants numerous objections at trial" and "the cumulative effect prejudiced defendant from having a fair trial." The trial court denied defendant's motion, and it sentenced him to concurrent terms of seven years' imprisonment for armed robbery and three years' imprisonment for attempted robbery. Defendant timely appealed.

¶ 24                                II. ANALYSIS

¶ 25                    A. *Corpus Delicti* of Attempted Robbery

¶ 26    Defendant first contends that his conviction for attempted robbery must be reversed where the State failed to prove him guilty beyond a reasonable doubt because it failed to prove

the *corpus delicti* of the offense. Specifically, he argues that there was no independent evidence to corroborate his confession to the police, namely because there was no testimony to support the notion that he returned to the Family Dollar to steal anything or to take property from Robinson either by force or threatening the use of force, and no corroborating evidence to show he even knew Robinson would be at the store that night.

¶ 27 In proving the defendant guilty of an offense, the State has two propositions it must prove beyond a reasonable doubt: (1) that a crime occurred, also known as the *corpus delicti*, and (2) that the crime was committed by the defendant. *People v. Lara*, 2012 IL 112370, ¶ 17. Oftentimes, the confession of a defendant is essential to proving the *corpus delicti* of the offense. *Id.* But because of the historical mistrust of confessions, "the *corpus delicti* cannot be proven by a defendant's admission, confession, or out-of-court statement alone." *Id.* ¶¶ 17, 19. Thus, in such cases, in order to sufficiently prove the *corpus delicti* of the offense, the State must present independent evidence to corroborate a confession. *Id.* ¶ 17.

¶ 28 The corroborating evidence need not independently prove the commission of the offense and need not corroborate each element of the offense, but rather it "need only *tend to show* the commission of a crime." (Emphasis in original.) *Id.* ¶¶ 18, 26. In other words, "corroboration is sufficient to satisfy the *corpus delicti* rule if the evidence, or reasonable inferences based on it, tends to support the commission of a crime that is at least closely related to the charged offense." *Id.* ¶ 45. What's more, "[e]ven if a defendant's confession involves an element of the charged offense, the independent evidence need not affirmatively verify those circumstances; rather, the evidence must simply 'correspond' with the confession." *Id.* (quoting *People v. Willingham*, 89 Ill. 2d 352, 359 (1982)). Any alleged corroborating evidence must be viewed in the light most favorable to the State. *People v. Pitts*, 2016 IL App (1st) 132205, ¶ 31. Whether the State proved

the *corpus delicti* of the offense is a question of law, which we review *de novo*. *Lara*, 2012 IL 112370, ¶ 16.

¶ 29    In the present case, the State presented sufficient independent evidence to prove the *corpus delicti* of defendant's attempted robbery of Robinson. First and foremost, in Robinson's testimony, she asserted that she witnessed two people throw objects at the store's glass door, and although she only observed them for a brief period of time, she was later able to identify defendant as one of those individuals based on his clothing, his eyes, nose and skin color. Robinson's testimony placed defendant at the scene of the crime. Additionally, the State admitted photographs from outside the store, which showed the cracked glass door and brick-like objects outside. Based on the photographs and Robinson's testimony, it was undisputed that the glass door was see-through, meaning it can reasonably be inferred that defendant was able to see Robinson inside the store and thus, knew that she was present.

¶ 30    Furthermore, when Robinson's testimony that this all occurred around closing time when she was counting the store's cash is viewed in the light most favorable to the State, it can also reasonably be inferred that defendant was attempting to break into the Family Dollar along with Jamal. Robinson's testimony substantially aligns with defendant's confession that, after he and Jamal failed to obtain money from Shamble, they decided to return to the Family Dollar before closing and rob the store. Although Robinson could not testify that defendant had the specific intent to take money in her presence by the use or threat of force, the corroborating evidence only needs to "tend[] to support the commission of a crime that is at least closely related to the charged offense." *Lara*, 2012 IL 112370, ¶ 45. Defendant posits that Robinson's testimony could only tend to support the crime of vandalism or some other minor property offense (see 720 ILCS 5/21-1; 21-1.3 (West 2010)), but her testimony equally supports the crime of attempted criminal

trespass to real property. See 720 ILCS 5/8-4(a), 21-3 (West 2010). Such an offense is sufficiently related to the attempt robbery based upon the circumstances. Lastly, Travis' testimony placed defendant and Jamal at the scene of the crime, and Officer Hatchett's testimony showed that defendant and Jamal were arrested together. Their testimony also aligns with defendant's confession that he and Jamal returned to the Family Dollar around closing time to rob the store. Together, the testimony from Robinson, Travis and Officer Hatchett does not give us any pause over the reliability of defendant's confession. See *Lara*, 2012 IL 112370, ¶ 47 ("The primary purpose of the corpus delicti rule is to ensure the confession is not rendered unreliable due to either improper coercion of the defendant or the presence of some psychological factor.")

¶ 31 Still, defendant highlights the decision in *People v. Wright*, 286 Ill. App. 3d 456, 461 (1996), where the appellate court reversed a defendant's conviction for attempted armed robbery based on a lack of independent corroborating evidence of his confession. In the decision, the appellate court utilized a principle of the *corpus delicti* rule that the independent corroborating evidence must "establish[] or tend[] to establish the *specific crime* charged." (Emphasis added.) *Id.* However, that is directly contradicted by our supreme court's statement in *Lara* that the corroborating evidence "is sufficient to satisfy the *corpus delicti* rule if the evidence, or reasonable inferences based on it, tends to support the commission of a crime *that is at least closely related to the charged offense*." (Emphasis added.) *Lara*, 2012 IL 112370, ¶ 45. Defendant's reliance on *Wright* is therefore misplaced. Consequently, the State presented sufficient independent evidence to prove the *corpus delicti* of the attempted robbery conviction.

¶ 32                          B. Phone Call Evidence

¶ 33   Defendant next contends that the trial court improperly allowed the State to admit into evidence the testimony by Officer Hatchett describing the two telephone calls he had with an unidentified male voice coming from a phone number identified on the cell phone as "Quise." Defendant argues that the State failed to properly provide a sufficient foundation for the admission of the testimony and the testimony itself was inadmissible hearsay that the court erroneously allowed into evidence to explain the course of the police investigation.

¶ 34   As previously mentioned, during the trial, Officer Hatchett testified that, as he searched Travis' vehicle after pulling him over, a cell phone rang that identified the caller as "Quise." When Officer Hatchett answered the phone, a male voice stated "cuz where you at? Is it hot over there?" Officer Hatchett responded "naw" to which the male voice replied and directed Officer Hatchett to a location. Officer Hatchett drove to that location, and the cell phone rang a second time, again from "Quise," and the same male voice from before directed Officer Hatchett to a second location. Officer Hatchett then drove to that second location, where he and a partner arrested defendant and Jamal.

¶ 35   The trial court has discretion in whether to allow certain evidence into trial. *People v. Pikes*, 2013 IL 115171, ¶ 12. As such, the court's decision concerning the admissibility of evidence will not be reversed unless the court has abused its discretion (*id.*), which occurs only if the court's decision was unreasonable or arbitrary such that no reasonable person would adopt the same view. *People v. Lovejoy*, 235 Ill. 2d 97, 125 (2009). One of the first steps in deciding whether evidence is admissible is determining if that evidence is relevant. Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). But even if evidence is relevant, it will be inadmissible if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation

of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Where certain evidence is relevant and not inadmissible under Rule 403, that evidence may still be inadmissible if it is hearsay and no exception applies (Ill. R. Evid. 802 (eff. Jan. 1, 2011)), or if the party offering the evidence fails to provide an adequate foundation for its admissibility. Ill. R. Evid. 901 (eff. Sept. 17, 2019). As evidence may be inadmissible on either hearsay or foundation grounds, we first examine defendant's argument that the phone call evidence was inadmissible hearsay.

¶ 36 Hearsay is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. *People v. Leach*, 2012 IL 111534, ¶ 66. Hearsay is inadmissible at trial unless the statement falls within an exception to the general prohibition. *People v. Tenney*, 205 Ill. 2d 411, 432-33 (2002). However, an out-of-court statement will not be hearsay in the first place if the statement is not offered to prove the truth of the matter asserted. *People v. Hanson*, 238 Ill. 2d 74, 102 (2010). One such common non-hearsay statement is when the statement is offered to prove the effect it had on the listener and why the listener subsequently acted in a certain manner. *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008).

¶ 37 Related to this concept, a police officer may testify to out-of-court conversations where "such testimony is not offered to prove the truth of the matter asserted by the other, but is used to show the investigative steps taken by the officer." *People v. Simms*, 143 Ill. 2d 154, 174 (1991). Specifically, under this rule, "a police officer may testify about a conversation that he had with an individual and his actions pursuant to the conversation to recount the steps taken in his investigation of the crime." *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 41. However, testimony offered for this purpose must be limited in scope, and "the police officer may not testify to information beyond what was necessary to explain the officer's actions." *Id.* As such,

Illinois courts have consistently "held that the State may not use the limited investigatory procedure exception to place into evidence the *substance* of any out-of-court statement that the officer hears during his investigation, but may only elicit such evidence to establish the police investigative process." (Emphasis in original.) *Id.* To this end, the well-established rule is that the State may elicit testimony that a conversation took place, but it cannot elicit testimony about the content of that conversation. See *People v. Gacho*, 122 Ill. 2d 221, 248 (1988); *People v. Davison*, 2019 IL App (1st) 161094, ¶ 31; *People v. Risper*, 2015 IL App (1st) 130993, ¶ 41.

¶ 38    In this case, Officer Hatchett's testimony about the phone calls went beyond the limited purpose of showing how his investigation of the robbery in progress call proceeded because he recounted the substance of the conversations with the unidentified male voice. Officer Hatchett could have accomplished the same purpose of explaining how he proceeded from stopping Travis's vehicle to going to two different locations in a short period of time in a manner that did not reveal the content of the two conversations. Officer Hatchett could have testified that, while he was searching Travis' vehicle, a cell phone rang and based on a conversation with the caller, he went to a nearby location. Then, once at that first location, the cell phone rang again, and based on a second conversation with the caller, he proceeded to another location. See *People v. Rush*, 401 Ill. App. 3d 1, 15 (2010) (observing that "an officer's testimony that he acted upon information received, or words to that effect, should be sufficient"); *People v. Warlick*, 302 Ill. App. 3d 595, 600 (1998) (observing that "[i]t would have been enough for the officer to testify he received a radio message, then went to the recycling center"). But because Officer Hatchett testified to the substance of the phone calls with the unidentified male voice, his testimony went behind what was necessary to explain his subsequent actions and constituted inadmissible hearsay. See *Ochoa*, 2017 IL App (1st) 140204, ¶ 41.

¶ 39   Moving on to the second aspect of Hatchett's testimony regarding the phone calls, which was his testimony that the caller identification listed "Quise" as the caller. In *People v. Caffey*, 205 Ill. 2d 52, 95 (2001), our supreme court considered a matter of first impression in Illinois of whether the information displayed from caller identification was hearsay. In ruling that it was not hearsay, the court explained that "there is no out-of-court asserter" as "the caller ID display is based on computer generated information and not simply the repetition of prior recorded human input or observation." (Internal quotation marks omitted.) *Id.* As such, the issue of admissibility turned on the reliability of the caller identification device. *Id.* From the context of *Caffey*, it is evident that the caller identification at issue was on a landline. In contrast, this case involves a cell phone, which oftentimes relies on human-generated information, *i.e.*, creating a contact in the phone by entering a person's name and his or her phone number. See *Holmon v. D.C.*, 202 A.3d 512, 519, n.8 (D.C. 2019) (finding "the display of a caller's identity on a cellphone might sometimes depend on human inputs (*e.g.*, the entry of a 'contact') rather than solely 'computer-generated data' ") (quoting *Inglett v. State*, 521 S.E.2d 241, 245 (Ga. Ct. App. 1999)). Based on the circumstances of the present case, it is clear that whomever the cell phone belonged to— likely Jamal based on Travis' testimony—created a contact with a phone number belonging to "Quise." Though no Illinois decision has discussed *Caffey* in relation to a cell phone, under the reasoning of the decision*,* the owner of the cell phone was an out-of-court asserter, and thus, Officer Hatchett's testimony that the cell phone identified "Quise" as the caller was hearsay.

¶ 40   Nevertheless, the State maintains that Officer Hatchett's testimony was offered entirely to show that he had knowledge of information given to him by the unknown declarant and that he acted upon that knowledge accordingly. In other words, the State posits that Officer Hatchett's testimony to "Quise" calling was not hearsay. In making this argument, the State concedes the

critical aspect of Officer Hatchett's testimony was that he received information and acted upon it, and the identity of the caller was immaterial. It therefore follows that there was no need to testify to the caller identification readout as the fact that the caller was "Quise" was irrelevant. Thus, when Officer Hatchett testified to the readout, he went beyond the limited purpose of showing how his investigation of the robbery in progress call unfolded, and thus, his testimony was inadmissible hearsay. See *Ochoa*, 2017 IL App (1st) 140204, ¶ 41.

¶ 41    Because Officer Hatchett's testimony in this manner was inadmissible based on well-established principles of the police-investigation rule, the trial court abused its discretion in allowing Officer Hatchett's testimony about the phone calls into evidence. Furthermore, because the evidence was inadmissible on hearsay grounds, we need not determine if the evidence was separately inadmissible on foundation grounds. However, merely because we found the State elicited inadmissible hearsay in defendant's trial does not mandate a reversal. Evidentiary errors do not require reversal if the errors were harmless. *People v. Thompson*, 2016 IL 118667, ¶ 67. The test is "whether it appears beyond a reasonable doubt that the error[s] at issue did not contribute to the verdict obtained." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008). In other words, the admission of inadmissible hearsay will not be considered reversible error "where there is no reasonable probability the jury would have found the defendant not guilty had the hearsay been excluded." *Ochoa*, 2017 IL App (1st) 140204, ¶ 58.

¶ 42    In the present case, the inadmissible hearsay was harmless. First, defendant admitted to the crimes charged. "[A] confession is the most powerful piece of evidence the State can offer." *People v. R.C.*, 108 Ill. 2d 349, 356 (1985). While defendant highlights that, at trial, he argued his confession was coerced and concocted, his confession was the subject of a pretrial motion to suppress. And the trial court denied that motion and found defendant's confession voluntary.

Moreover, the jury clearly did not think his confession was coerced or concocted, as it ultimately found defendant guilty of both crimes. Defendant's confession is thus extremely persuasive evidence of his guilt for both offenses. See *People v. Clay*, 349 Ill. App. 3d 24, 30 (2004) (stating that "confessions frequently constitute the most persuasive evidence against a defendant").

¶ 43    Specific to defendant's attempted robbery conviction, in his confession, he conceded he went to the Family Dollar to rob the store after Jamal was unsuccessful in robbing Shamble. Furthermore, he readily admitted they went there "right before closing," from which it is reasonable to infer that he knew the store would still have an employee or employees present. And, as discussed in the *corpus delicti* portion of this order, there was sufficient independent corroborating evidence from Robinson's testimony to support his conviction for attempted robbery. Given defendant's confession and Robinson's identification of him as one of the two individuals throwing objects at the Family Dollar's glass door, there was overwhelming evidence that defendant committed the attempted robbery. See *People v. Smith*, 341 Ill. App. 3d 530, 547 (2003) (finding in an ineffective assistance of appellate counsel claim that the defendant suffered no prejudice where his oral confession and positive identification as the perpetrator rendered the evidence overwhelming against him).

¶ 44    Specific to defendant's armed robbery conviction, in his confession, he acknowledged devising a plan to rob Shamble as she went to the bank with money from the Family Dollar. Although he claimed he did not know Jamal would spray mace on her, Jamal undoubtedly did so and Shamble identified Jamal from a lineup as her attacker. It is well-established that, under the law of accountability, an individual is accountable for another's actions when they share a common criminal design even if the individual did not actively participate in an overt criminal act (*People v. Taylor*, 164 Ill. 2d 131, 140 (1995)) and did know the other person would use a

weapon in furtherance of the planned crime. See *People v. Fernandez*, 2014 IL 115527, ¶ 13 (stating that "if 'two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts' ") (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)); see also *People v. Griffin*, 368 Ill. App. 3d 369, 373 (2006) (noting that, under an accountability theory, "a defendant can be found guilty of felony murder based on residential burglary even if he or she did not know about the weapon before the commission of the crime"). Consequently, there was overwhelming evidence that defendant committed the armed robbery.

¶ 45    Nevertheless, defendant claims that the evidence supporting his conviction for armed robbery was weak and highlights the trial court's comment during its consideration of his motion for directed verdict that the armed robbery was "a close call." However, defendant completely mischaracterizes the court's remarks. The court's "close call" comment only concerned the armed component of the armed robbery and involved whether using pepper spray could constitute a dangerous weapon for purposes of the armed robbery statute.[2] See 720 ILCS 5/18-2(a)(1) (West 2010) (stating that to be convicted of armed robbery for being armed without a firearm, a person must be armed with "a dangerous weapon"). We note multiple cases have found that, indeed, pepper spray can constitute a dangerous weapon for purposes of the armed robbery statute. See *People v. Curry*, 2018 IL App (1st) 153635, ¶ 17; *People v. Lampton*, 385 Ill. App. 3d 507, 514-15 (2008). But more importantly, the court's "close call" comment had nothing to do with defendant's involvement in a common criminal design being in question.

---

[2] Although defendant's indictment referred to pepper spray, the evidence at trial revealed primarily that Jamal had used mace rather than pepper spray. But Detective Growe testified that mace and pepper spray are similar.

Given defendant's confession to both crimes and corroborating evidence of both, the evidence of his guilt was overwhelming in this case. Consequently, had Officer Hatchett's testimony about the phone calls been excluded, there is no reasonable probability the jury would have found defendant not guilty.

¶ 46                                C. Rebuttal Closing Argument

¶ 47    Defendant lastly contends that he was denied a fair trial by the State's repeated improper remarks during its rebuttal closing argument that served to minimize its burden of proof and at times, shift that burden onto him.

¶ 48    During closing argument, the State has wide latitude in its remarks. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). The State may comment on the evidence presented and draw reasonable inferences from that evidence, even if they reflect poorly on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). The State may also respond to arguments from defense counsel that clearly provoke a response. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). However, the State may not argue assumptions or facts that are unsupported by the record. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Furthermore, it is axiomatic that the State has the burden of proof in a criminal trial. *People v. Howery*, 178 Ill. 2d 1, 32 (1997). Comments by the State that minimize its burden of proof or shift its burden onto the defendant are improper. *People v. Ligon*, 365 Ill. App. 3d 109, 125 (2006); *People v. Edgecombe*, 317 Ill. App. 3d 615, 622-23 (2000). Such comments often deny the defendant his constitutional right to a fair trial. *People v. Adams*, 281 Ill. App. 3d 339, 346 (1996). When viewing challenged comments, we must consider them in their full context and view the closing arguments in their totality. *Nicholas*, 218 Ill. 2d at 122.

¶ 49 Previously, this court has stated that a conflict exists regarding the proper standard of review concerning the alleged impropriety of remarks made during closing argument. See *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 35; *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 32. However, in *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 63-64, this court resolved the apparent conflict and determined that we review whether remarks made during closing argument were improper for an abuse of discretion but we review whether improper remarks were so egregious to warrant a new trial *de novo*. Because the initial question is whether the State's remarks were improper at all, we review this question for an abuse of discretion and turn to the first comments at issue.

¶ 50 Defendant first argues that the State shifted or minimized its burden of proof when it argued that defendant had the obligation to present evidence that Jamal somehow obtained knowledge from an independent source about how the Family Dollar store operated in order to facilitate the offenses. The State never argued that defendant had an obligation to present any evidence. In the State's rebuttal argument, in response to defense counsel's argument that defendant was not involved in the crimes, the State posited that he was, in fact, the central figure to both offenses. The State remarked that defendant was the only reason Jamal would know the right time to rob Shamble. In supporting this assertion, the State stated "[h]ow does Jamal Drayton know that she's the manager? How does he know that what she's carrying is supposed to be a bag for the bank? How does he know she's even on the way to the bank? How does he know those things *** if this defendant didn't tell him?" The State added "[t]here's no evidence that Jamal even ever went inside that store, that he knew anyone else that worked there. There's no evidence of any of that." Regarding the attempted robbery and how Jamal would know when

the store closed, the State asserted that "[t]here's no evidence that Jamal Drayton knew" what time the store closed. And "[t]here's no evidence that he had been there before."

¶ 51    The State's remarks were proper, as it merely responded to the defense's theory of the case that he was not involved. See *People v. Phillips*, 127 Ill. 2d 499, 526 (1989) (an attack on a particular theory of defense generally does not indicate an improper shift of the burden of proof); *People v. Chaban*, 2013 IL App (1st) 112588, ¶ 63 (in closing arguments, a prosecutor may challenge the defense's characterizations of the evidence and comment on the persuasiveness of the defense). The State may point out that, given the evidence elicited at trial, a defense theory defies logic. See *Glasper*, 234 Ill. 2d at 212. The State merely assailed the defense's theory that Jamal, not defendant, was the chief offender by asking rhetorical questions if that theory made any sense given the evidence presented during trial.

¶ 52    Defendant next argues that the State shifted or minimized its burden of proof when it mischaracterized his theory of the case and suggested that he had an obligation to prove the existence of a conspiracy. The State never suggested that defendant had an obligation to prove the existence of a conspiracy to find him guilty of the crimes. In the State's rebuttal argument, it responded to defense counsel's claim about the legitimacy of defendant's confession to Detective Growe and remarked "part of [defense] counsel's theory appears to be that this statement is a fabrication by Detective Growe, that somehow a grand conspiracy evolved *** to frame this defendant for this crime. Where is there evidence of that? Where is there evidence that Detective Growe had even met this defendant?"

¶ 53    Initially, we disagree that the State mischaracterized defense counsel's theory of the case. In defendant's closing argument, defense counsel challenged defendant's confession by arguing that it was not voluntarily given and highlighted that his statement to the police lacked important

details about the commission of the offenses. Defense counsel argued that, because of this, the statement was "concocted" by "the police." To this end, counsel asked "[w]ho prepared" the confession and answered "[o]nly Detective Growe." As such, defense counsel clearly argued to the jury that defendant's confession was not the product of his own volition, and the natural inference from that argument is that Detective Growe, who interviewed him, attempted to pin multiple offenses on him of which he was actually innocent. It was reasonable for the State to characterize defense counsel's argument as a conspiracy. See *People v. Temple*, 2014 IL App (1st) 111653, ¶¶ 70-72 (finding the State properly responded to defense counsel's argument by asserting "[i]f I hear counsel's argument, there was some big conspiracy that was put together in the murder, attempt murder, and [defendant] just sits here today"). Although defendant highlights that a legal conspiracy requires more than one person (see 720 ILCS 5/8-2 (West 2010)) and his defense counsel's argument only concerned Detective Growe, the State was not arguing about a conspiracy as a legal term of art but rather in the colloquial sense. In any event, Detective Growe testified that he interviewed defendant along with another detective. Thus, it was reasonable for the State to characterize defense counsel's theory as a conspiracy given the presence of two detectives interviewing defendant when he confessed and because defense counsel argued that his confession was "concocted" by "the police," though counsel later focused on Detective Growe who had transcribed defendant's oral confession. Furthermore, the mere fact that the State called it a "grand" conspiracy was well within the bounds of proper argument of which the State has wide latitude. See *Hudson*, 157 Ill. 2d at 441.

¶ 54    Moreover, the State's response to defense counsel's argument concerning defendant's confession in no way minimized or shifted the State's burden of proof. The State again was merely assailing defense counsel's theory about the confession in rhetorical fashion, pointing out

that nothing in the evidence supported the claim that defendant's confession was involuntary. See *Glasper*, 234 Ill. 2d at 212 (where in rebuttal argument the State asked "[w]here's the evidence of that" in response to a defense counsel's claim of a coerced confession, "the State pointed out that no evidence existed in this case to support defendant's theory of coercion" and it "did not shift the burden of proof to defendant, or imply that defendant was required to present evidence"). Thus, the State's remarks about defendant's confession were proper.

¶ 55    Defendant lastly argues that the State shifted or minimized its burden of proof when it referred to the State's burden as "not beyond all doubt," "not an impossible burden" and "a burden that's met day after day in courtrooms across this country."

¶ 56    It is well-established that neither the trial court nor the attorneys should attempt to define the reasonable doubt for the jury. *People v. Downs*, 2015 IL 117934, ¶ 19. This is because " 'reasonable doubt' is self-defining and needs no further definition." *Id.* But our supreme court has previously found substantially identical language from the State during closing argument to be proper and not shift or minimize its burden of proof. See, *e.g.*, *People v. Moore*, 171 Ill. 2d 74, 104 (1996) (finding nothing improper with the State asserting "[defense counsel] would have you believe there's an impossible burden to be met, but the burden here is the same burden as in every courtroom in this building and every courtroom in Will County, going on everywhere in the United States from 1776 to date, and it's met every single day"); *People v. Phillips*, 127 Ill. 2d 499, 527-28 (1989) (finding nothing improper with the State asserting that the reasonable doubt standard "is the same standard, the same burden that is applicable in all criminal cases. *** Every criminal case that is tried in this courtroom, in this county, in this state and in this country in any type of criminal case" and the State remarking that reasonable doubt "is not proof beyond all doubt, it is not proof beyond any doubt, it is proof beyond a reasonable doubt").

¶ 57 Similarly, this court has previously found substantially identical language from the State during closing argument to be proper and not shift or minimize its burden of proof. See *e.g.*, *People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 90-91 (finding nothing improper with the State asserting that the reasonable doubt standard "isn't beyond any doubt in the world, any crazy doubt") (Emphasis omitted); *People v. Burney*, 2011 IL App (4th) 100343, ¶¶ 66-68 (finding nothing improper with the State asserting that the reasonable doubt standard "does not mean beyond all doubt"); *People v. Laugharn*, 297 Ill. App. 3d 807, 810-12 (1998) (finding nothing improper with the State asserting that the reasonable doubt standard is "not beyond all doubt or any doubt") (Emphasis omitted). In the present case, the State discussed the reasonable doubt standard in substantially similar terms to the State's remarks in *Moore*, *Phillips*, *Thompson*, *Burney* and *Laugharn*, which were all deemed proper. Consequently, the State's remarks did not shift or minimize its burden of proof.

¶ 58 Nevertheless, defendant highlights this court's decisions in *People v. Burman*, 2013 IL App (2d) 110807 and *People v. Mena*, 345 Ill. App. 3d 418 (2003). In *Burman*, 2013 IL App (2d) 110807, ¶ 40, the State asserted in closing argument that reasonable doubt was " 'not beyond all doubt' " and was " 'not beyond an unreasonable doubt.' " This court criticized the State for its comments and found them to improperly define reasonable doubt by "describing what it is not." *Id.* ¶ 44. In *Mena*, 345 Ill. App. 3d at 427, the State asserted in closing argument that it " 'need not prove guilt beyond all doubt, and that juries across the country find evidence in other cases sufficient to meet the burden.' " This court criticized the State for its comments and found them to be improper. *Id.* However, both decisions stand in contrast to *Moore*, *Phillips*, *Thompson*, *Burney* and *Laugharn*, and the weight of authority therefore goes against them. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 65 (noting the contrast between other cases and *Burman*);

*People v. Ward*, 371 Ill. App. 3d 382, 422-23 (2007), *abrogated on other grounds by People v. Ayres*, 2017 IL 120071 (noting the contrast between other cases and *Mena*). The decisions in *Burman* and *Mena* therefore do not persuade us.

¶ 59    But, in any event, both courts in *Burman*, 2013 IL App (2d) 110807, ¶ 47 and *Mena*, 345 Ill. App. 3d at 427, found that the State's comments did not rise to the level of reversible error. Although we do not find the State's comments about reasonable doubt exceeded the bounds of reasonable argument, assuming *arguendo* that they were improper under *Burman* and *Mena*, they clearly would not have risen to the level of reversible error.

¶ 60    Furthermore, because we found Officer Hatchett testified to inadmissible hearsay, we briefly note that, even if the State's comments about reasonable doubt exceeded the bounds of reasonable argument, that error along with the admission of the inadmissible hearsay would not constitute cumulative reversible error. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). "However, the cumulative errors that warrant such an extreme result must themselves be extreme." *People v. Desantiago*, 365 Ill. App. 3d 855, 871 (2006). "There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue." *People v. Green*, 2017 IL App (1st) 152513, ¶ 118. Assuming *arguendo* that the State improperly commented on the reasonable doubt standard, that even in conjunction with the admission of inadmissible hearsay, would not lead us to conclude that defendant was denied a fair trial given that both errors would be relatively innocuous and the overwhelming evidence of defendant's guilt for both offenses.

¶ 61                             III. CONCLUSION

¶ 62    For the foregoing reasons, we affirm the judgments of the circuit court of Cook County.

¶ 63    Affirmed.