2024 IL App (1st) 221854-U

No. 1-22-1854

Order filed May 24, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 14783 |
| | ) | |
| BRIAN SMITH, | ) | Honorable |
| | ) | John F. Lyke Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mitchell and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions are affirmed where he failed to preserve the issues for review. No clear or obvious error occurred where the State and its witnesses referred to the decedent using the term victim and, to the extent the State improperly referenced hearsay testimony during closing argument, defendant cannot establish either prong of the plain error doctrine.

¶ 2    Following a jury trial, defendant Brian Smith was convicted of the first-degree murder of

Tearra Campbell (720 ILCS 5/9-1(a) (West 2018)) and home invasion (720 ILCS 5/19-6(a)(1)

(West 2018)). The court imposed consecutive prison terms of 50 years and 20 years, respectively.

On appeal, defendant argues that the trial court erred in (1) permitting the State and its witnesses to refer to Campbell as a victim in a self-defense case, and (2) allowing the State to elicit inadmissible hearsay that he stalked Campbell and to reference that testimony during closing argument. We affirm.

¶ 3    Prior to trial, defendant moved to discharge counsel and proceed *pro se*, which the trial court allowed.[1] During pretrial proceedings, defendant moved *in limine* to prohibit the State from referring to Campbell as a victim, arguing that the case involved self-defense. The State responded that Campbell was a victim and it intended to refer to her that way. The court allowed the State to refer to Campbell as a victim. During opening statements, the State did not refer to Campbell as a victim.

¶ 4    At trial, Dorothy Merritt testified that Campbell was her cousin and resided in an apartment on 75th Street and Chappel Avenue in Chicago. In May 2019, however, Campbell stayed with Merritt and Merritt's grandmother. The State asked why Campbell was staying there and Merritt responded, "[s]he said her boyfriend [had] been stalking her." Defendant objected that the answer was conclusory and hearsay. The court sustained the objection.

¶ 5    The following colloquy then occurred:

"THE STATE: Without getting into what *** Tearra said to you, do you know why she was staying at your grandmother's *** house? ***

THE DEFENDANT: Objection, hearsay. Again, she did not know and conclusion.

THE COURT: That's overruled. She can answer.

THE STATE: You can answer.

_____

[1] The court appointed the Office of the Cook County Public Defender to serve as standby counsel.

THE WITNESS: Yes, her boyfriend was stalking her.

THE DEFENDANT: Objection, conclusion, your Honor.

THE COURT: Overruled. You can cross on it."

¶ 6    Merritt further testified that, at the time, she did not know the name of Campbell's boyfriend and referred to him as "the truck driver." Merritt noticed that Campbell "kept turning her phone off a lot," and her phone would ring from a contact saved as "Do Not Answer," which she would not answer.

¶ 7    On May 31, 2019, Merritt observed Campbell wearing a wristband with mace attached. At approximately 7 p.m., Merritt and Campbell went to Campbell's third-floor apartment on Chappel. While there, Merritt heard Campbell's phone ring more than five times from Do Not Answer. Campbell eventually answered the phone, and Merritt heard a male's voice. Campbell told the person where she was. Merritt snatched the phone from Campbell and hung up. Merritt clarified that Campbell disclosed to the person that she was at home, which upset Merritt because Campbell previously told her that "he was stalking her and they had little problems going on." Defendant objected. The court overruled the objection, noting that the testimony was "not offered for the truth of the matter asserted."[2]

¶ 8    As Merritt and Campbell exited the apartment through the rear door, Merritt observed a man ascending the stairs. Merritt identified defendant in court as that man. Defendant "froze in his steps" and looked at Merritt. Merritt yelled to Campbell, asking if she knew the man, and she and Campbell ran into the apartment. Defendant "charged" up the stairs and "threw his body into the

---

[2] The court did not issue a limiting instruction to the jury.

door." Merritt and Campbell tried to slam the door, but defendant entered the apartment. All three were in the kitchen, and defendant smelled of alcohol.

¶ 9    After approximately five minutes, defendant attempted to kiss Campbell, but Campbell refused. Defendant then sighed, breathed "really heavy," put his thumb in his pocket, and began tapping. Campbell attempted to slide the wristband mace off her arm, but did not remove it or spray it at anyone. Then, defendant retrieved a black knife from his right pocket and stabbed Campbell in her chest. Defendant's back was towards Merritt, and she grabbed a pot and hit him. Defendant "charged" towards Merritt, but looked back at Campbell and stabbed her again. Merritt hit defendant again and ran from the apartment. She screamed for help and called the police.

¶ 10    Later, Merritt met with Chicago police detective James Regnier and identified defendant in a photo array. Merritt confirmed that defendant was the individual whom she referred to as the truck driver and observed ascending the stairs and stabbing Campbell.

¶ 11    On cross-examination, Merritt testified that she knew defendant stalked Campbell because Merritt "heard it from her." Merritt did not know if Campbell called the police regarding defendant stalking her. She knew defendant's number was saved as Do Not Answer because she recognized his voice from prior phone calls.

¶ 12    Eddie Johnson testified that in 2019, defendant, whom he identified in court, was his neighbor. Johnson resided on 74th Street and Chappel. On May 31, 2019, at approximately 6 p.m., Johnson conversed with defendant on the block. Defendant appeared agitated and stated that he was "going through something" with a woman who lived on the third floor of the building behind where they were standing. Defendant explained that he and the woman had a disagreement, and she disrespected him. Johnson asked defendant if he had been drinking, and defendant stated that

he had "a little Remy." Defendant reiterated that the woman had disrespected him, and he needed "to try to catch her" and "should do her." Defendant had a black knife on his belt or in his pocket on the right side of his body. After this conversation, Johnson left. When Johnson returned, he observed officers on the third floor of the building where defendant said the woman resided and also on the second floor of the building across the street where defendant resided. On June 17, 2019, Johnson met with a detective and identified defendant from a photo array as the individual with whom he conversed.

¶ 13 Chicago police officer Jeremy Arrington testified that on May 31, 2019, at approximately 8:08 p.m., he responded to a reported stabbing on the 7400 block of South Chappel. On the third floor of the building, he observed a "bloody" female lying on the kitchen floor. No one else was in the apartment. The State published officer Arrington's body-worn camera footage, which is included in the record on appeal and has been viewed by this court. The footage depicts him entering Campbell's apartment through the rear door, stepping over her body, and "clearing" a room. On cross-examination, officer Arrington testified that he did not hear the 911 call and was unsure who called.

¶ 14 Chicago police officer Julio Zavala testified that he and his partner responded to a reported stabbing. At the scene, officer Zavala observed a woman waving from a second-floor window. They proceeded to the woman's apartment, where they observed her holding a knife. The woman directed them towards a bloody shirt near the front door. Officer Zavala learned the woman's name was Mary Smith, and she was defendant's mother.[3]

---

[3] Since Mary Smith shares the same last name as defendant, we will refer to her by her first name.

¶ 15    After officer Zavala conversed with Mary, defendant became a suspect for the stabbing. officer Zavala searched Mary's apartment for defendant, who was not present. Officer Zavala found a black cell phone on a sink. Mary searched the phone for a picture of defendant, which she showed the officers. The State published portions of their body-worn camera footage, which is included in the record on appeal and has been viewed by this court. The footage is consistent with officer Zavala's testimony.

¶ 16    On cross-examination, officer Zavala testified that Mary did not tell him that defendant told her to call the police. Mary stated that she obtained the knife from defendant's pocket.

¶ 17    Chicago police detective Roger Murphy testified that he responded to the scene and observed the "victim" lying face down on the kitchen floor and blood spatter on the cabinets, wall, and refrigerator. The State asked whether detective Murphy noticed "anything unusual on the victim's back," and detective Murphy responded that he saw a bloody shoe print on her back and a cannister of "protective mace" nearby. Detective Murphy then went to Mary's apartment, where he observed a colorful orange shirt that appeared to have red blood stains. Near the windowsill and radiator, he noticed a cell phone and a black handled knife inside a black sleeve. During detective Murphy's investigation, Merritt gave him a pink iPhone belonging to the "victim Tearra." On cross-examination, detective Murphy testified that the mace could have been used for protection or as a weapon.

¶ 18    Detective Regnier testified that on May 31, 2019, he conducted a photo array with Merritt, who identified the "person who was sneaking around the back of the house" and "standing in front of her for about 5 minutes."

¶ 19    Chicago police detective David Sipchen testified that on June 17, 2019, he presented a photo array to Johnson, who identified the individual who had been "upset over [a] disagreement with his girlfriend."

¶ 20    Juan Aguirre, an evidence technician, testified that he recovered an orange "tie dye T-shirt," knife, and sheath from Mary's apartment. The shirt and knife had suspect bloodstains. Aguirre also went to Campbell's apartment. When describing the photographs taken of Campbell, Aguirre referred to her as "the victim."

¶ 21    Dr. Marta Helenowski, a Cook County assistant medical examiner, testified that she performed Campbell's autopsy. The State inquired whether Dr. Helenowski had experience "perform[ing] autopsies on stabbing victims," and she replied affirmatively. During Campbell's autopsy, Dr. Helenowski observed more than 20 "sharp force injuries," including 11 incised wounds and 9 stab wounds. Dr. Helenowski recovered Campbell's clothing and took fingernail clippings from her hands. Dr. Helenowski concluded that Campbell's cause of death was multiple sharp force injuries, and the manner of death was homicide. On cross-examination, Dr. Helenowski testified that "THC" was present in Campbell's blood.

¶ 22    The court admitted into evidence certified T-Mobile subscriber information for the black LG cell phone and Campbell's cell phone.

¶ 23    Chicago police detective James Browne testified that he analyzed a pink iPhone and a black LG cell phone. The report from the pink iPhone indicated that it was "Tearra's iPhone," and a number saved in her phone as Do Not Answer was associated with the black LG cell phone. Detective Browne generated a report from the iPhone regarding text messages between that phone

and the black LG cell phone. He conducted a "complete analysis" of the data on the black LG cell phone, which had the iPhone's number saved as "Scam Likely."

¶ 24    Detective Browne published text messages from an exchange between the two cell phones. Messages from the black LG cell phone stated, "I'm glad this is all over with," "I didn't want to kill you," and "there's no better payback than seeing you decapitated." On the day of the incident, a message from the black LG cell phone to the iPhone stated, "don't be in the hood when I be there." The iPhone responded, "[d]on't make me go to the cops. Because this is a threat, right?" Later, the black LG cell phone texted, "[b]ut I'm not going to kill you because I have a good life to live and you don't." On cross-examination, detective Browne testified that "Tearra's iPhone" had not blocked the number from the black LG cell phone.

¶ 25    Elizabeth Zawicki, a forensic scientist, confirmed that she was assigned a case involving "a victim by the name of Tearra Campbell." She examined the t-shirt, knife, and sheath and found blood on the shirt and knife. She swabbed the sheath for DNA.

¶ 26    Sarah Ann Lusk, former DNA analyst with Bode Technology, testified that Bode performed DNA analysis for a case involving "a victim by the name of Tearra Campbell." The analysis established that Campbell's DNA was found on a t-shirt and swabs from a knife.

¶ 27    East Peoria police officer Adam Chittick testified that on September 26, 2019, around 11 p.m., he encountered defendant in a closed park. Defendant provided identification information that officer Chittick determined was false. Officer Chittick learned defendant's identity and that he had an arrest warrant for first-degree murder. Defendant was transported to a jail in Pekin, Illinois.

¶ 28    Chicago police officer Bradley Scaduto testified that on September 27, 2019, he transported defendant from Pekin to Chicago. During the transport, without prompting, defendant spoke about "how much time he would get for *** first degree murder" and stated that "it's probably not going to be second degree murder because he had pleasure doing it." On cross-examination, Officer Scaduto testified that there was no video or audio recording of those statements.

¶ 29    Chicago police detective Patrick Thelen testified that when defendant arrived in Chicago, he was placed in an interview room that was equipped with video and audio surveillance. The court admitted the recording into evidence and published it. The footage, which is included in the record on appeal and has been viewed by this court, depicts defendant standing in a room speaking with someone outside of the frame. Defendant states that he was dating "a girl" for approximately a year and fell in love. He learned that she was cheating on him, and he was hurt because he accepted her when other men would not, and "that's why [he] ended up doing what [he] did." Defendant looks into the camera and asks if his statement is being recorded, and the individual responds that he or she is unsure. On cross-examination, detective Thelen confirmed that he Mirandized defendant.

¶ 30    The Stated entered into evidence defendant's birth certificate, which reflected the name of Brian Christopher Smith with a birthdate of February 15, 1984.

¶ 31    Defendant testified that he and Campbell had been "together" for approximately 1½ years and had "some issues and some problems sometimes," but they would "break up to make up." Defendant wanted "the family thing," but Campbell was "sleeping around with other men," which

"messed [him] up." According to defendant, Campbell was staying at her grandmother's house because "girls around the neighborhood *** wanted to kick her a**."

¶ 32    On May 31, 2019, defendant drove from Indiana to his cousin's house in Chicago and had a few drinks. He called Campbell, and she told him that she was at her residence with her cousin. Defendant informed her that he was on his way.

¶ 33    When defendant arrived on Chappel, he saw Johnson and told him that he was upset about Campbell cheating, and "[he] should kind of do her the way she did [him]." Defendant testified that in regard to Johnson's testimony, defendant was "100 percent sure [he] didn't say [he] would do her." Defendant went to his mother's residence, then to Campbell's residence. He ascended the stairs and saw Merritt. Campbell's apartment door was open, so he entered. Defendant testified that he was there "to make up" with Campbell and not to "intentionally" kill her.

¶ 34    Campbell accused defendant of being with another woman, which he disputed. He attempted to kiss Campbell, and she refused. Campbell told him she would "get back" at him and would continue "doing what [she was] doing." Defendant told her that he would continue "doing what [he was] doing," and then Campbell sprayed mace in his face and eye. He could not see but heard Campbell yell, "[g]et him, get him, get him off me, get him." Someone hit defendant's head from behind with a frying pan, leaving him "dazed." Defendant did not know who else was present, so he retrieved his knife and "swung at the person who swung at [him]."

¶ 35    Defendant opened his right eye and saw Merritt running, which "pissed [him] clean off." He went into a "blind rage," but was not trying to do "anything specific." Then, he saw blood on the floor and "tried to see if [Campbell] was okay." He did not know what to do, so he returned to his mother's residence and told her, "I messed up, I did something wrong *** we need to call the

police." He explained to her that he hurt Campbell and did not know if she was dead. He left his mother's apartment because he felt in "danger of [his] life."

¶ 36   On cross-examination, defendant stated the mace blinded his left eye, and he was hit multiple times in the head while holding Campbell with his left hand. He retrieved his knife and stabbed Campbell repeatedly but did not know how many times.

¶ 37   Following cross-examination, defendant further testified that during the incident at Campbell's apartment, he was "in a blind rage literally and mentally" and was fighting to protect himself. He left his mother's residence because he was afraid.

¶ 38   In closing, the State argued that "[d]efendant had been stalking" Campbell, and Merritt "knew he had been stalking her cousin." According to the State, defendant charged into Campbell's residence and was "rebuffed by the victim, by Tearra." The State further argued that "the knife ha[d] the victim's blood on it," and defendant was not justified in killing Campbell. During rebuttal argument, the State further argued that defendant "pierced the victim's rib cage" with the knife.

¶ 39   The court instructed the jury regarding second degree murder. The jury found defendant guilty of one count of home invasion and two counts of first-degree murder.

¶ 40   Defendant moved for a new trial, which the court denied. The court merged the first-degree murder counts and imposed consecutive prison terms of 50 years for first-degree murder and 20 years for home invasion.

¶ 41   On appeal, defendant first contends that he was denied a fair trial when the court permitted the State and its witnesses to refer to Campbell as a victim in a self-defense case. Defendant also

contends that whether Campbell was a victim was a disputed issue and the term implied that he was guilty.

¶ 42    As an initial matter, this issue was not preserved for review. To preserve an issue for appellate review, a defendant must object at trial and raise the error in a written posttrial motion; otherwise, the issue is considered forfeited. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 16. Defendant objected to the use of the word victim in a motion *in limine* but did not object to the use of the term in his posttrial motion. However, he requests review under the plain-error doctrine.

¶ 43    Under the plain-error doctrine, a reviewing court may consider forfeited errors when a clear or obvious error occurred and (1) the evidence "is so closely balanced that the jury's guilty verdict may have resulted" from the error "and not the evidence," or (2) the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Jackson*, 2022 IL 127256, ¶ 19. Defendant argues both prongs. Under either prong, defendant bears the burden of proving actual error to excuse forfeiture. *Id.* Absent clear or obvious error, there can be no plain error. *People v. Khan*, 2021 IL App (1st) 190679, ¶ 105. Accordingly, we must first determine whether error occurred. *People v. Logan*, 2024 IL 129054, ¶ 53.

¶ 44    Evidentiary rulings are within the sound discretion of the trial court and will not be reversed without an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Id.* Regarding the propriety of the State's arguments, this court has reasoned that an abuse of discretion standard pertains to the trial court's determinations regarding the State's arguments, while the *de novo* standard concerns whether the State's remarks were so egregious as to warrant a new trial. See, *e.g.*, People *v. Cook*,

2018 IL App (1st) 142134, ¶ 64 (comparing *People v. Blue*, 189 Ill. 2d 99 (2000) with *People v. Wheeler*, 226 Ill. 2d 92 (2007)).

¶ 45    Turning first to the State's use of the term victim, defendant argued in his motion *in limine* that the term should be disallowed because he acted in self-defense. Although the trial court denied the motion, the State did not refer to Campbell as a victim during its opening statement and, during trial, primarily referred to Campbell as "Tearra." Although the State referred to her as a victim during closing argument, this comported with the State's theory that defendant intentionally killed Campbell and that she was, in fact, a victim. See *People v. Kliner*, 185 Ill. 2d 81, 154 (1998) (arguments that are "based on reasonable inferences drawn from the evidence are within the scope of proper argument"). As for the witnesses' use of the term victim, we observe that defendant's motion *in limine* was directed only at the State's use of the phrase; defendant never objected to the witnesses' use of that word before or during trial. Consequently, the trial court never had occasion to make an evidentiary ruling upon the propriety of the witnesses' use of the term victim.

¶ 46    In any event, defendant identifies no Illinois case law supporting his proposition that a defendant asserting self-defense is denied a fair trial because the State or its witnesses referred to the individual killed as a "victim." To the contrary, this court has rejected the argument or held that the term was not so prejudicial as to deny the defendant a fair trial. See *People v. Wasmund*, 2022 IL App (5th) 190525, ¶¶ 71, 99 (conviction affirmed where prosecution's use of term "victim" intermittently during four-day trial was not error although defendant claimed to have acted in defense of property); see also *People v. Zernel*, 259 Ill. App. 3d 949, 957 (1994) (noting term "victim" was used in criminal statute); *People v. Anderson*, 234 Ill. App. 3d 899, 909 (1992) (conviction affirmed where court admonished the State and witness not to refer to decedent as

victim; although defendant argued self-defense, "later usage of decedent's name cured any prejudice"). Accordingly, no error occurred in the State and its witnesses describing Campbell as a victim.[4] Thus there can be no plain error, and we honor defendant's forfeiture of the issue. *Khan*, 2021 IL App (1st) 190679, ¶ 105.

¶ 47    Next, defendant argues that the court erred in permitting the State to elicit inadmissible hearsay that Smith was stalking Campbell. In support of this position, defendant notes that the State did not proffer a non-hearsay purpose for the testimony and, during closing argument, stated that defendant stalked Campbell. This issue also was not preserved for review, but defendant seeks review under both prongs of the plain error doctrine. As noted, our first inquiry is whether error occurred. *Logan*, 2024 IL 129054, ¶ 53.

¶ 48    Out-of-court statements offered to prove the truth of the matter asserted are considered hearsay. *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 38. Hearsay is generally inadmissible unless it qualifies as an exception to the hearsay rule. *People v. Cook*, 2018 IL App (1st) 142134, ¶ 31. When a statement is offered for a purpose other than to prove the truth of the matter asserted, it is not hearsay and is admissible. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 351 (2010). Whether evidence is admissible is in the trial court's discretion, and this court will not disturb the ruling absent an abuse of discretion. *Ochoa*, 2017 IL App (1st) 140204, ¶ 39.

---

[4] In so holding, we acknowledge that defendant cites as persuasive authority the concurring opinion in *People v. Zabrzenski*, 2023 IL App (1st) 220428-U, ¶ 83 (Ellis, J., concurring) (noting that "[i]t may often be the case, even in a self-defense trial, that an occasional, casual reference to 'victim' to describe the decedent is not enough to warrant a new trial," but positing the term "should not be used to describe the decedent or complainant in a self-defense case"). See Ill. S. Ct. R. 23(b), (e)(1) (eff. Feb. 1, 2023) (although nonprecedential, orders filed under Supreme Court Rule 23(b) on or after January 1, 2021, may be cited as persuasive authority). Under the facts of this case, we find the published authority on this issue persuasive.

¶ 49 Defendant asserts that Merritt's testimony that Campbell told her he was stalking Campbell was inadmissible hearsay. Here, the State asked Merritt why Campbell was staying at her grandmother's house; Merritt replied that Campbell had said her boyfriend was "stalking her." The court sustained defendant's objection. During a subsequent colloquy, the State asked Merritt whether she knew why Campbell was staying at her grandmother's house. On this occasion, the court overruled defendant's objection but noted that he could cross-examine the witness. Later, Merritt testified that during a phone call, Campbell told her location to defendant, and this upset Merritt because Campbell had stated that defendant "was stalking her." The court overruled defendant's objection, noting that the testimony was "not offered for the truth of the matter asserted." Later, during closing arguments, the State argued that "[d]efendant had been stalking" Campbell, and Merritt "knew he had been stalking her cousin."

¶ 50 To the extent the State referenced this testimony during closing argument for the truth of the matter asserted, such argument was improper. See *People v. Burton*, 2012 IL App (2d) 110769, ¶ 14 ("it was improper for the prosecutor to refer to the substance of [a witness's] statement, which was not admitted into evidence").

¶ 51 Defendant did not object to this argument and, therefore, the court had no opportunity to exercise discretion in ruling upon the propriety of the argument. Even accepting that error occurred, however, the evidence was not closely balanced as to first-degree murder or home invasion.

¶ 52 In determining whether evidence was closely balanced, a reviewing court must "review the entire record and conduct a qualitative, commonsense assessment of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses'

credibility." (Internal quotation marks omitted.) *People v. Williams*, 2022 IL 126918, ¶ 58. Where the only evidence is the equally credible testimonies of the State's witnesses and the defendant, a "contest of credibility" exists, and the evidence is closely balanced for first prong plain error review. *People v. Naylor*, 229 Ill. 2d 584, 606-611 (2008). The evidence is not closely balanced where other evidence corroborates or contradicts either version, or the defendant's version of events is not credible. See *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90.

¶ 53 As charged, a person commits home invasion "when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present" and "[w]hile armed with a dangerous weapon, other than a firearm, uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs." 720 ILCS 5/19-6(a)(1) (West 2018)).

¶ 54 As for defendant's murder conviction, he does not dispute that he killed Campbell but claims that he acted in self-defense. To establish self-defense, a defendant must show that "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35.

¶ 55 Here, the State's evidence included Merritt's testimony that defendant forced entry into Campbell's apartment, tried to kiss Campbell, and began tapping his pocket when she refused. Then, defendant retrieved a knife from his pocket and stabbed Campbell in the chest. Merritt struck defendant with a pot and he charged at her, but then he turned toward Campbell and continued stabbing her. According to Merritt, Campbell never removed or sprayed her mace. Dr. Helenowski

testified that Campbell suffered 9 stab wounds and 11 incised wounds. The State also adduced evidence that defendant told Johnson that he should "do" Campbell, and text messages from defendant to Campbell stated there was "no better payback than seeing [her] decapitated." The police officer who transported defendant from Pekin to Chicago following his arrest testified that defendant stated he "had pleasure" from killing Campbell.

¶ 56 Defendant, in contrast, denied making the particular statement to Johnson. He claimed the door to Campbell's residence was open and acknowledged that Campbell refused to kiss him but claimed that she then sprayed mace in his face and eye. According to defendant, someone hit his head with a frying pan, so he began swinging his knife. After Merritt fled, defendant went into a "blind rage," saw blood on the floor, and then went to his mother's residence where he told her that he hurt Campbell and did not know if she was dead. Then, defendant fled his mother's residence because he feared for his life.

¶ 57 Although defendant testified, we are not faced with equally credible accounts without corroboration, and so no contest of credibility exists. See *Naylor*, 229 Ill. 2d at 606-611. As noted, Merritt described how defendant forced entry to the apartment and her account of the severity of the attack was corroborated by Dr. Helenowski's testimony describing the extensive injuries to Campbell. Defendant's testimony regarding his "blind rage" also contradicted his claim that he was only acting in self-defense, as did evidence that he made statements threatening Campbell's life and expressing satisfaction in her murder. Moreover, defendant fled Campbell's apartment without seeking help for her after she was incapacitated by the 20 knife wounds he inflicted. Accordingly, the evidence was not closely balanced and defendant's request for review under the first prong of plain error analysis lacks merit. *Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90.

¶ 58     To the extent defendant alleges second prong plain error, we disagree. Second-prong plain error is akin to structural errors that erode the integrity of the judicial process and undermine the fairness of the defendant's trial. *People v. Clark*, 2016 IL 118845, ¶ 25. Errors that meet the standard for second-prong plain error include "(1) a complete denial of counsel, (2) trial before a biased judge, (3) racial discrimination in the selection of a grand jury, (4) denial of self-representation at trial, (5) denial of a public trial, and (6) a defective reasonable doubt instruction." *People v. Williams*, 2022 IL App (2d) 200455, ¶ 120. Defendant posits the use of hearsay "undermine[d] the presumption of *** innocence," but this conclusory assertion is insufficient to carry his burden of establishing second-prong plain error. See, *e.g.*, *People v. Temple*, 2014 IL App (1st) 111653, ¶ 51 (complained-of errors, including hearsay statements and prosecutorial misconduct in closing and rebuttal arguments, did not constitute second-prong plain error).

¶ 59     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 60     Affirmed.